**KINGMAN REEF ATOLL INVESTMENTS, L.L.C., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 06–828L.

United States Court of Federal Claims.

March 8, 2012.

Natural Resources Division, United States Department of Justice; Robert J. Smith, Assistant Chief, Office of General Counsel, Navy Litigation Office; and Mariel J. Combs, Office of the Solicitor, United States Department of the Interior, of counsel.

## ORDER

HORN, Judge.

### FINDINGS OF FACT

Since the issuance of the court's earlier opinion on issues of jurisdiction, discovery has continued. The parties also were offered an opportunity to review and offer comments on the facts included in the court's earlier opinion given their complexity. The revised facts, with a number of the parties' recent suggestions incorporated, as well as a chronology of more recent developments in this case, are included below. This order addresses motions filed by defendant with respect to several plaintiffs asking to revisit issues of jurisdiction.

Plaintiffs Kingman Reef Atoll Investments, L.L.C. (KRAI) and Kingman Reef Atoll Development, L.L.C. (KRAD) have brought a takings claim before this court. KRAI alleges that it holds fee simple absolute title to Kingman Reef and that the United States government took its real property interest without payment of just compensation. Plaintiffs allege that this taking occurred on January 18, 2001, when the Secretary of the Interior established the Kingman Reef National Wildlife Refuge (NWR). Plaintiffs seek the payment of just compensation, in the amount of $54,500,000.00, pursuant to the Fifth Amendment to the United States Constitution for the alleged taking of their private property for public use.

Therese Y. Cannata, Cannata, Ching & O'Toole, LLP, San Francisco, California. With her were Christian P. Porter, Porter, Tom, Quitiquit, Chee & Watts, LLP, Honolulu, Hawaii, of counsel.

Kristine S. Tardiff, Trial Attorney, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her were Ignacia S. Moreno, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice. John P. Tustin, Environment and

Plaintiffs allege that the Kingman Reef NWR, by prohibiting public access to Kingman Reef, prohibits fishing in over 450 square miles in what plaintiffs allege to be "some of the most productive open ocean fishing grounds in the world," and takes all rights to access, use, enjoy, conserve, and economically develop Kingman Reef and its surrounding waters from the plaintiffs. Plaintiffs claim that Kingman Reef's eco-

nomic value and/or commercial use includes ecotourism, recreational fishing tourism, commercial fishing operations and a transfer station for fishing operations (i.e., fishing vessels coming in from distant areas, transferring the fish to a small boat and transporting it to Honolulu).

Plaintiff KRAI is a Hawaii limited liability company that claims to hold both legal and equitable title to the Kingman Reef atoll, as well as its lagoon, submergent and emergent coral reefs, and surrounding waters. According to plaintiffs, members of the Fullard–Leo claimed ownership of Kingman Reef in 1922, and KRAI acquired title to Kingman Reef on November 17, 2000. Dudley and Ainsley Fullard–Leo, collectively (and sometimes together with Leslie and Ellen Fullard–Leo, both deceased, and/or the Fullard–Leo family [1]) were or are managers of KRAI.

Plaintiff KRAD is a Hawaii limited liability company that is managed by Peter B. Savio, the Fullard–Leo family's real estate agent and representative. On November 17, 2000, KRAD entered into a real property lease agreement with KRAI concerning the use, economic development and protection of Kingman Reef.

In accordance with the alleged private property rights vested by the real property lease, on November 17, 2000, KRAD also entered into a real property license agreement with Kingman Reef Enterprises, L.L.C. (KRE), a Washington limited liability company. KRAD licensed KRE to operate a commercial fishing base camp at Kingman Reef and conduct commercial fishing in and around the waters of Kingman Reef for a term of thirty years.

Defendant United States is a governmental entity whose valid exercise of sovereignty over Kingman Reef is undisputed by all of the parties in the case. Kingman Reef is currently classified by the United States as an unincorporated United States Territory without an Organic Act. Both KRAI and the United States claim fee title absolute ownership to Kingman Reef.

**Fullard–Leo Family Successors Allege They have Acted as the Owner of Kingman Reef**

In addition to annexing Kingman Reef, paying real property taxes on the land, and granting access to third parties, plaintiffs KRAI and KRAD allege that, from 1922 to the present, KRAI and its predecessors-in-interest have acted consistent with their ownership of Kingman Reef. For example, plaintiffs allege that when unauthorized uses of Kingman Reef were discovered, the Fullard–Leo family took appropriate action to stop those uses. Additionally, the Fullard–Leo family and its agent allegedly stopped the unauthorized use by a person from Hilo, Hawaii who was fishing commercially in and around Kingman Reef without permission.

Mr. Savio, on behalf of the Fullard–Leo family and plaintiff KRAI, alleges to have made voyages to Kingman Reef at the Fullard–Leo family's expense in order to survey the property. Leslie Fullard–Leo and Mr. Savio, allegedly accessed Kingman Reef numerous times since the 1940s. Dudley Fullard–Leo alleges that his brother Leslie Fullard–Leo accessed Kingman Reef in the 1940s on a ship called Joyita and again by ship in the mid-to-late 1950s. Moreover, Mr. Savio, in a sworn declaration, stated that, during the late 1980s, he traveled to and inspected Kingman Reef in a United States Air Force aircraft with representatives of the Bikini Islands as part of a proposed government project, possibly with the Department of the Interior (DOI), to purchase Palmyra Atoll and Kingman Reef, and to determine if those areas were suitable for displaced residents of the Bikini Islands. Ainsley Fullard–Leo, in a sworn declaration, stated that, in or about 1986, he "accompanied the U.S. Coast Guard during one of its laws enforcement air patrols to Palmyra and Kingman Reef." Additionally, in a sworn declaration, Ainsley Fullard–Leo stated that he "over flew Kingman Reef on several occasions since the 1980's [sic]." Dudley Fullard–Leo testified at his April 11, 2007 deposition in *Kingman Reef Atoll Investments, L.L.C. v. United States,* 545 F.Supp.2d 1103 (D.Haw.2007),

---

1. The Fullard–Leo family is also the former owner of Palmyra Atoll (or Island), located near

Kingman Reef, which the family conveyed to The Nature Conservancy (TNC) in the late 1990s.

*aff'd,* 541 F.3d 1189 (9th Cir.2008), that he has not accessed Kingman Reef, but only flown over it, correcting a former declaration that he had actually accessed Kingman Reef numerous times since the 1940s.

From the 1960s to 1980s, Martin Vitousek, a professor at the University of Hawaii, requested permission to visit and was granted access to Kingman Reef, planting coconut trees on Kingman Reef at the Fullard–Leo family's request. Additionally, over about a 20 year period, and as recently as 2002, Ainsley Fullard–Leo gave permission to Bill Austin, captain of the ship Machais to visit Kingman Reef, although there also is an indication in the record of a Navy grant of permission. In a declaration, executed on July 19, 2007, Bill Austin stated that "I have obtained permission from the Fullard–Leo family to call at Kingman Reef Atoll for about seven voyages over the years. I know that no other authorization was required because on my first voyage in about 1966, the United States Customs and someone else (I do not recall who) told me that Kingman Reef and Palmyra were privately owned and to contact the family."

In October 1995, Bryant Fullard–Leo, Dudley Fullard–Leo's son, stated he accompanied Mark Collins, a private fisherman, to survey in and around Kingman Reef over a two week period. Additionally, on August 1, 1997, Mr. Savio, in his capacity as president of Palmyra Development Co., Inc., wrote a letter to Joe Dettling of Kailua–Kona, Hawaii. Mr. Dettling was allegedly fishing in and around Palmyra Island and Kingman Reef, as well as planning to use the lagoons of both islands for a seaplane and fishing operation. Threatening legal action to enforce the Fullard–Leo family's right to exclude, Mr. Savio informed Mr. Dettling that both Palmyra Island and Kingman Reef and their "lagoons, reefs and territorial waters are private property" and advised Mr. Det-

tling that he "cannot enter into these areas without permission." Subsequently, in a follow-up letter dated March 19, 1998, which Mr. Savio carbon copied to Scot Yamashita, Assistant Special Agent In Charge at the United States Department of Commerce, National Oceanic and Atmospheric Administration's (NOAA) National Marine Fisheries Service, Mr. Savio wrote to Mr. Dettling:

> In earlier discussions and letters, you stated that Scot Yamashita of the National Marine Fisheries service had given you permission to fish in and around the waters at Palmyra Island. I checked with Mr. Yamashita, and in a letter dated August 2, 1997, he advised you that no permission was given to fish within the existing three (3) mile limit around Palmyra and Kingman Reef as established by the owners.

Later, in 1997 or 1998, Ainsley and Dudley Fullard–Leo indicated they traveled to Palmyra and, on the way, had the pilot circle Kingman Reef to inspect and ensure that no unauthorized uses were evident. In 1998 or 1999, Ainsley Fullard–Leo and his wife allegedly inspected Kingman Reef by air.

Moreover, Charles Cook of TNC stated in his March 26, 2007 deposition in *Kingman Reef Atoll Investments, L.L.C. v. United States,* 545 F.Supp.2d 1103,[2] that National Aeronautics and Space Administration (NASA) Astronaut Charles "Chuck" F. Brady, Captain, United States Navy, who was both providing support services for TNC in its acquisition of Palmyra in 1991 and "[t]esting communications equipment for NASA" on his first trip to Palmyra Atoll in 1997, requested that Ainsley Fullard–Leo give him permission to access Kingman Reef to test HAM amateur radio. Mr. Savio stated in a sworn declaration that Captain Brady "visited Kingman Reef twice in the late 1990's and

**2.** In his March 26, 2007 deposition, Mr. Cook claimed that TNC never had an interest in purchasing Kingman Reef and that it was Mr. Savio, and not TNC, who initially proposed that the acquisition of Kingman Reef be considered as a part of TNC's ongoing acquisition plan for Palmyra Atoll. Mr. Cook did not recall the details regarding possible sale and/or acquisition of Kingman Reef, stating "my business was to try to successfully acquire Palmyra Atoll. The Nature Conservancy did not have a dog on Kingman Reef. To me that was background noise. That was not part of my focus objectives, and so I wasn't concerned with it. From a Nature Conservancy's perspective we had one concern, and that was the successful acquisition of the Palmyra Atoll."

on each visit requested permission to go to Kingman Reef" from the Fullard–Leo family.

Plaintiffs allege that "[t]here is no evidence that the government used the property for any purpose prior to January 18, 2001, except when it visited the property, after obtaining permission from the Fullard–Leo family." Plaintiffs also allege that the United States Navy has repeatedly acknowledged the Fullard–Leo family's ownership of Kingman Reef and has asked for permission to have access to Kingman Reef. Plaintiffs allege that on numerous occasions since the issuance of Executive Order No. 6935 in 1934 and Executive Order Nos. 8682 and 8729 in 1941, regarding the Navy's jurisdiction over and administration of Kingman Reef and its surrounding waters, the Navy has directed requests for authorization to visit or access Kingman Reef to the Fullard–Leo family for review and approval. Specifically, over the past thirty years, plaintiffs allege that the Fullard–Leo family, plaintiff KRAI and their agent Mr. Savio, received referrals from the United States Navy, United States Coast Guard and/or United States National Marine Fisheries Service from persons and/or entities interested in entering upon and traversing across Kingman Reef. Plaintiff KRAI was asked, and did give permission, to third parties from the private and public sectors, including HAM radio operators, scuba divers, and photographers, to access Kingman Reef. In a sworn declaration, Ainsley Fullard–Leo indicated that Petty Officer Miller of the Pearl Harbor Naval Base telephoned him "inquiring about the status of Kingman Reef and whether [he] was the owner because an inquiry was received from a photographer wanting" to visit and photograph Kingman Reef.

Mr. Savio, in a sworn declaration, stated that over the past thirty years, "I received at least ten (10) referrals from the Navy, possibly more. That is, a person would call me requesting permission to go to Kingman Reef, I would ask how he got my name, and he told me that a representative of the U.S. Navy (at Pearl Harbor) referred him." Mr. Savio further stated that the Navy and United States Coast Guard both referred HAM amateur radio operators seeking permission to broadcast from Kingman Reef to him. Mr. Savio claimed that "[i]n order for [HAM radio operators'] broadcasts from a particular location to be considered legitimate, however, they must obtain permission to broadcast from the legal owner of the property," which they did by first contacting the Navy or the Coast Guard to ascertain the identity of the legal owner of Kingman Reef. Mr. Savio, in a sworn declaration, stated that "[o]ver the years, the Fullard–Leo family, as the legal owners of Kingman Reef, have received inquiries from both the U.S. Department of the Interior, FWS [Fish and Wildlife Service], the City & County of Honolulu, and the State of Hawaii to purchase Kingman Reef. I represented the Fullard–Leo family in those negotiations and discussions." On instructions from the Fullard–Leo family, Mr. Savio required that any visitor to Kingman Reef obtain written permission and execute a release form. Navy personnel who contacted Mr. Savio allegedly acknowledged that the Fullard–Leo family owned Kingman Reef and that third party requests to access Kingman Reef were to be directed to the Fullard–Leo family. Accordingly, plaintiffs allege that they still owned Kingman Reef, that the government repeatedly acknowledged such ownership in its own documents in the 1990s and 2000, that the government was preparing to pay the Fullard–Leo family for a fee interest and that plaintiffs leased out the fishing rights around Kingman Reef in 2000.

Defendant specifically denies that KRAI, the Fullard–Leo family or any of their agents, associates, or representatives were authorized at any time to grant permission to access Kingman Reef, stop commercial fishing in and around Kingman Reef, survey and/or inspect Kingman Reef. Defendant further denies that KRAI, the Fullard–Leo family and any of their agents, associates, or representatives were authorized to visit Kingman Reef themselves without first obtaining permission from the United States Navy or the United States Department of the Interior, Fish and Wildlife Service (FWS or USFWS), because, defendant alleges, Kingman Reef is federal property. However, the record contains no evidence that the federal government actually interfered with

the Fullard–Leo family's access to and use of Kingman Reef between 1934 and 2001.

**Physical Description of Kingman Reef**

Kingman Reef is a low-lying coral reef atoll located in the Pacific Ocean. It is situated approximately 900 nautical miles south of Hawaii and 33 nautical miles north of the Palmyra Atoll, at Latitude 6° 24' 37" North and Longitude 162° 22' West. It is comprised of two small "spits" of emergent land/coral reefs, a central lagoon, and surrounding submergent coral reefs and waters. Kingman Reef has been described as "one of the most pristine coral reef ecosystems in the Pacific . . . and supports a diversity of marine invertebrates, algae, fishes, marine mammals, and sea turtles and [is] an important foraging ground for Pacific migratory seabirds." However, the reef "is unsuitable for human habitation, due to the small size of emergent land spits and lack of fresh water." Moreover, Kingman Reef "is awash most of the time," has been described as "a maritime hazard and the atoll is unusable for practical purposes."

**Initial Acquisition and History of Kingman Reef**

Kingman Reef was first discovered in 1798 by Captain Edmund Fanning. The island was visited in 1853 by Captain W.E. Kingman, for whom it was named, while aboard the American ship, Shooting Star. Subsequently, Captain W.W. Taylor, in his affidavit of February 12, 1858, listed islands in the position of Kingman Reef and Palmyra Atoll as guano islands and, along with other alleged guano islands in the Pacific, passed these islands by assignments to the United States Guano Company. In 1860, the United States Guano Company claimed Kingman Reef, also known as "Dangers Rock," and Palmyra Atoll, also known as "Palmyros," as United States Territories under the Guano Islands Act of 1856, codified at 48 U.S.C. §§ 1411–1419 (2006). In 1933, the Office of

the Legal Advisor, United States Department of State, wrote that Kingman Reef, under the alias Dangers Rock, "appears on the lists of Guano Islands appertaining to the United States compiled by the Treasury Department" on August 23, 1867. Further, as of September 16, 1893, the United States Department of the Treasury listed both "Dangers Rock" and "Palmyros" as guano islands that were "bonded" by the Guano Company of New York, under Bond No. 9, on February 8, 1860.[3]

In 1922, Lorrin A. Thurston, agent of the Fullard–Leo family, plaintiffs' predecessors-in-interest, claimed to have annexed Kingman Reef to the sovereignty of the United States and claimed legal ownership of Kingman Reef for The Island of Palmyra Copra Company (Copra Co.), a corporation under the laws of the then Territory of Hawaii. At an April 28, 1922 board meeting for the Copra Co., "[i]t was reported that a plan was on foot to claim Kingman's Reef, [as it was] still believed that this Reef could be of inestimable value to [the] Company and should be claimed for the Company either on the out or homeward voyage of the Palmyra during her next trip." On May 3, 1922, the Copra Co.'s Board instructed and commissioned Mr. Thurston, as its agent, to "take formal possession" of Kingman Reef on behalf of the United States and "claim the same for Island of Palmyra Copra Company." In that commission, the Copra Co. asserted that Kingman Reef had hitherto not "been claimed by any other government or people."

On May 10, 1922, Mr. Thurston landed on Kingman Reef, allegedly annexing the atoll, its reefs and lagoon to the United States and claiming ownership of the property for the Copra Co. Mr. Thurston and five companions read aloud and signed a formal certificate of possession/annexation, which states:

BE IT KNOWN TO ALL PEOPLE—that on the Tenth day of May A.D. 1922, the

3. 1 Moore's *Digest of International Law* 567–68 (Washington, D.C.: Government Printing Office 1906). Moore's *Digest of International Law* lists 41 guano islands of actual guano deposits, including brief histories and data regarding their respective discoverers. *Id.* at 569. The data was compiled from information collected at the Department of State and elsewhere. *Id.* It included

"islands that have not been, as well as those that have been, considered as appertaining to the United States." Notably, these data neither reference Kingman Reef nor its alias Dangers Rock and, therefore, do not provide information regarding the alleged discoverer of the supposed guano deposits said to be found on the island. *Id.* at 569–80.

undersigned, agent of the ISLAND OF PALMYRA COPRA CO., LTD. (an Hawaiian Corporation), landed from the motorship "Palmyra" doth ... take formal possession of this Island called "Kingman's Reef"... on behalf of the United States of America, and claim the same for said Company.

The party built a cairn of coral slabs about four feet high and flew an American flag from a pole supported by the cairn. The formal certificate of possession, the flag, and a copy of two Hawaiian newspapers, *The Honolulu Advertiser* and *The Honolulu Star-Bulletin*, dated May 3, 1922, were placed in a glass jar that was deposited in the base of the coral cairn. Plaintiffs allege that the annexation procedure was intended to, and did, vest fee title ownership to Kingman Reef in the Copra Co., which annexed the Kingman Reef to the United States solely for the purpose of extending United States sovereignty over the island. Plaintiffs allege that the annexation was neither intended to, nor actually vested, title in the defendant. In support of this argument, plaintiffs point to the certificate of annexation/possession signed by Mr. Thurston, which expressly stated that he claimed Kingman Reef as property of the Copra Co.

A few days later, on May 13, 1922, Mr. Thurston wrote a letter to Ellen Fullard-Leo, in which he confirmed that he had claimed fee title ownership to Kingman Reef for the Copra Co. Further, in accordance with alleged instructions from Mr. Huber, whom Mr. Thurston identified as the "United States Attorney General" for the Territory of Hawaii, Mr. Thurston instructed Ellen Fullard-Leo to file the title claim with the Department of State in Washington, D.C. Subsequently, on July 15, 1922, Ellen Fullard-Leo, in her capacity as Secretary-Treasurer of the Copra Co., sent a letter to the Secretary of State, Charles E. Hughes, in which

she advised him that the Copra Co. had annexed on May 10, 1922

> in the name of the United States of America, and for [the Copra Co.'s] own use, an atoll island charted as "Kingman's Reef" but never before claimed.... According to the United States Attorney here, this notification is all that is necessary in addition to listing the same in our local tax returns, as the Palmyra Islands are a part of the county of Honolulu. Hoping that this is sufficient evidence that the same will be recorded and due credit given this Company and Territory....

Ellen Fullard-Leo also enclosed a copy of the certificate of possession/annexation, a report by Mr. Thurston, and newspaper reports covering the annexation and acquisition of Kingman Reef. Moreover, from 1922 until 1959, as per Mr. Huber's alleged instructions, the Fullard-Leo family paid real property taxes to the Territory of Hawaii for both Palmyra Atoll and Kingman Reef on the same tax key. After Hawaii received statehood in 1959, Hawaii state taxes were not levied because Palmyra Atoll and Kingman Reef were not incorporated as a part of the lands of the State of Hawaii. In an April 30, 1998 memorandum on Palmyra Ownership Tidelands, Suzanne Case of TNC, included Section G, titled, "Does Kingman Reef belong to the Fullard-Leos?" and stated that "[t]he Fullard-Leos paid Hawai'i [sic] property taxes on Kingman Reef until 1959."

On August 14, 1922, the Copra Co.'s Board, by unanimous resolution, conveyed its interest in Kingman Reef to Ellen Fullard-Leo for the nominal consideration of one dollar and sundry unsecured loans.[4] Subsequently, on August 24, 1922, Ellen Fullard-Leo sent a follow-up letter to the Secretary of State, inquiring as to whether her July 15, 1922 letter had been received. On September 28, 1922 the Department of State acknowledged receipt of July 15 and August 24, 1922 letters and enclosures regarding the

---

4. By mesne conveyances from Ellen Fullard-Leo, title to Kingman Reef was allegedly held collectively in trust by brothers Leslie Vincent, Ainsley and Dudley Fullard-Leo, children of Leslie and Ellen Fullard-Leo. Plaintiffs allege that the Fullard-Leo family owned and held title to Kingman Reef from 1922 to November 17, 2000, when the

trustee-brothers transferred title to plaintiff KRAI, the family's limited liability company. On November 17, 2000, title to Kingman Reef was conveyed by the Fullard-Leo family to plaintiff KRAI by way of a deed filed and recorded in the United States District Court for the District of Hawaii.

Copra Co.'s alleged annexation and ownership of Kingman's Reef. In its response, although the Department of State neither disputed the Copra Co.'s claim to ownership of Kingman Reef, nor asserted that the United States owned the atoll, the letter did not explicitly recognize fee title ownership in the Fullard–Leo family. Defendant currently alleges that the Department of State did not dispute the Copra Co.'s 1922 "claim" to fee title ownership of Kingman Reef because it was not legally obligated to do so.

In November 1924, W.G. Anderson and others visited Kingman Reef, where they inspected the bottle deposited by Mr. Thurston in 1922 and left their own record in the cairn. On June 22, 1925, Mr. Thurston wrote a letter to Admiral R.E. Coontz, U.S.N., in which he suggested that the United States Navy secure both Palmyra and Kingman Reef for "refreshment and supply stations both for naval ships and flying boats" and noted that Kingman Reef together with Palmyra "passed, by purchase, into the ownership of Mrs. E. Fullard–Leo, an American citizen, of Honolulu." In that letter, Mr. Thurston wrote that he had "sailed direct from Honoluly [sic] to Kingman's [sic] landed and annexed the Island, in the name of the Palmyra Co., an American Company, in accordance with the terms of American law." Mr. Thurston further wrote: "Upon my return to Honolulu in 1922, seven weeks after the annexation incident above-referred to, I found that the existence of the Island which I had reported, was questioned at Washington. . . ." Following his assertion that he did, in fact, discover an island called Kingman Reef, Mr. Thurston suggested that the Navy should "secure for its files, definite data concerning both the Palmyras and Kingman's [sic], both as to present conditions and a rough estimate of the cost for making both places available as refreshment and supply stations, both for naval ships and flying boats."

Defendant, on the other hand, points to a statement of John L. Padgett, First Mate on the 1922 voyage to Kingman Reef, that the

United States holds title to Kingman Reef under the Guano Acts. In a May 1937 article, Seaman Padgett indicated that it was the position of the United States government in general, and the Navy in particular, that Kingman Reef did not exist. In the article, Seaman Padgett stated:

> In 1921, the *Sailing Directions for the North Pacific Islands* gave the correct position [for Kingman Reef] but then noted—"Existence Doubtful." This Federal Government printed book in one breadth warned all ships to avoid the spot and in the next told the wandering seamen not to be surprised if they did not find it. Since no one was sure it was there no one claimed it. . . . On my return to Honolulu I was called before Rear–Admiral Edward Simpson [5] and staff. They still seemed to believe the *Sailing Directions* "Existence Doubtful" but after a morning of questions let me go back to my drawing board. Shortly after this the U.S. Navy sent a Mine Sweeper down which found Kingman Reef and that made it official.

A year later, in June 1926, Mr. Thurston revisited Kingman Reef as a guest on the Navy's U.S.S. Whippoorwill, under the command of Lieutenant Poland, U.S.N. During this time, Mr. Thurston examined the record, jar and flag that he had left on Kingman Reef in 1922. In order to protect the flags and records from disintegration, as the bottle top was rusted and cork partially rotted, Mr. Thurston removed both the 1922 and 1924 records. By way of a July 9, 1926 letter, Mr. Thurston deposited these items with the Archives Commission of the Territory of Hawaii, located in Honolulu. Captain Poland signed a certificate evidencing Mr. Thurston's removal of the 1922 and 1924 reports, which had been enclosed in a bottle and left in the cairn on Kingman Reef. A copy of Captain Poland's certificate also was deposited with the Archives Commission. Further, Mr. Thurston stated in his July 9, 1926 letter that he "understand[s] the present owner of said Kingman Island to the Mrs. E. Ful-

---

5. Admiral Simpson served as the Hydrographer for the United States Navy Hydrographic Office from March 1919 to December 1919.

lard[-]Leo of Honolulu, the successor of said Palmyra Company, Limited."

In response, on July 24, 1926, the Archives Commission acknowledged receipt of "two glass containers—a fruit jar and beer bottle—received from" Mr. Thurston. The response further stated that "both containers are deposited with the Archives of Hawaii commission, as objects of record, relative to the formal annexation of Kingman's Reef (Island) to the United States of America." Moreover, the commission stated that the jars and their contents "form an official part of our Archives of Hawaii[, but are] 'subject to the order of the owner of said Kingman Island, or of the United States Government.'" Referencing Mr. Thurston's letter, the Archives Commission also acknowledged Mrs. Ellen Fullard–Leo as the owner of Kingman Reef.

On August 5, 1931, Leslie Fullard–Leo requested that the commanding officer of the United States Geodetic Survey ship Pioneer make detailed surveys of Palmyra Island and Kingman Reef. The United States Department of Commerce, Coast Guard and Geodetic Survey, on September 30, 1931, responded that the request would be given "careful consideration" when its then current "program in Hawaii has reached an advanced stage of completion."

**1933–1934 Department of State Reports**

On January 9, 1933, the Office of the Legal Advisor, Department of State, issued a publication entitled *The Sovereignty of Guano Islands in Pacific Ocean.* The purpose of this publication was to "set forth the various claims of limited jurisdiction, or of full sovereignty which have been made to the islands, with a view to determining the present status of the United States claims to territorial sovereignty over them." Office of the Legal Advisor, *The Sovereignty of Guano Islands in Pacific Ocean* 580 (Washington, D.C.: Department of State 1933) (hereinafter *Sovereignty*). Regarding the list of guano islands found in Moore's *Digest of International Law,* the Legal Advisor specifically noted that, by way of information gathered from archival papers not consulted by Moore, "some of the islands described apparently do not exist, and that most of them do not now,

and never did contain guano." *Sovereignty* at 579. In the report, "Kingmans Reef" was listed under islands "not claimed by any other Government." *Id.* at 571. Although Kingman Reef was listed as appertaining to the United States in 1867, the Legal Advisor, with specific regard to the United States' claim to Kingman Reef under the Guano Act, stated:

> There is no other mention of Dangers Rock on file in the State Department. It is not by any means certain that there is or was any guano on this island, or even that there is such an island. It is, however, practically certain that no guano was ever removed from it, at least by claimants under the Guano Act. Moreover, Taylor's "discovery" may well have been fictitious, and he probably did not even land there.

*Id.* at 624–25.

Next, the Legal Advisor discussed the United States' claim to Kingman Reef "through [a]ppropriation by an American [c]itizen." *Id.* at 625. The Legal Advisor recounted Mr. Thurston's May 10, 1922 voyage to Kingman Reef and acknowledged the Copra Co.'s July 15, 1922 notification to "the State Department that it had annexed Kingmans Reef in the name of the United States and for its own use...." *Id.* Then, in reference to the information sent by the Copra Co. to the Secretary of State in 1922, the Legal Advisor stated:

> [I]t appears that the [Copra Co.] ... had now turned to fishing and was interested in acquiring whatever island there might be on Kingmans Reef for a fishing base.... It appears also that an island said to be dry at high tide, and to bear no signes [sic] of any submergence by the sea, and composed of broken coral and sand, actually was found, landed upon, and formally annexed.

*Id.* at 626.

Later, in the "CONCLUSIONS" section of that same report, the Legal Advisor listed Kingman Reef under "ISLANDS TO WHICH THE UNITED STATES ONLY HAS A CLAIM." *Id.* at 875. Specifically regarding Kingman Reef, the Legal Advisor wrote:

It is difficult to reach definite conclusions on the legal status of Kingmans Reef because of lack of information. It is not known whether or not there has been any occupation or use of the Reef by American citizens; and it is not even certain that there is an island there which is dry at high tide. However, it may be said: first, the United States has no valid claim to Kingmans Reef arising under the Guano Act; and second, the United States has an inchoate right to the Reef, possibly because of its discovery by Captain Kingman, if he was an American, as seems probable, and because of the formal possession taken by the Island of Palmyra Copra Company, and its use by that company, if there has been any such use. As yet there has been no formal sanction of the company's act by the United States. However, no other Government appears to claim Kingmans Reef, and it would seem that the United States Government could extend its jurisdiction over the island (always supposing that an actual island exists) and that it could then be considered as a part of the territory of the United States. Before any such action is taken, it might be adviseable [sic] to find out if Kingmans Reef is of any possible use to American citizens, or to the Government.

*Id.* at 875–76.

### President Roosevelt's 1934 Executive Order and its History

On December 29, 1934, President Franklin D. Roosevelt issued Executive Order 6935. Executive Order No. 6935 was issued pursuant to authority vested in the President by the act of "June 25, 1910, ch. 421, 36 Stat. 847, as amended by the act of August 24, 1912, ch. 369, 37 Stat. 497" and ordered that "Kingman Reef, Wake Island, and Johnston and Sand Islands, together with their surrounding reefs, in the Pacific Ocean" be

reserved, set aside, and placed under the control and jurisdiction of the Secretary of

the Navy for administrative purposes, subject, however, to the use of the said Johnston and Sand Islands by the Department of Agriculture as a refuge and breeding ground for native birds as provided by Executive Order No. 4467 of June 29, 1926.

Exec. Order No. 6935 (Dec. 29, 1934).[6] The Executive Order further states that it "shall continue in full force and effect until revoked by the President or by an act of Congress."

The Franklin D. Roosevelt presidential papers include an October 16, 1934 letter, from Secretary of the Navy, Claude Swanson, to President Roosevelt with a memorandum and enclosures concerning the ownership or sovereignty of certain Pacific Islands. The memorandum listed twelve Pacific islands and also "indicated the country exercising ownership or sovereignty in each case." Both Palmyra and Kingman Reef were listed as under the United States, but the memorandum did not mention specifically whether the United States exercised ownership or sovereignty. In Enclosure (B), Kingman Reef was listed as under the "Jurisdiction" of the United States and was described as having a military strategic importance for patrolling maritime steamer routes "between Honolulu ... and Australia" and "from Panama to the Orient." Secretary of the Navy letter, Oct. 16, 1934, encl. (B) at 6. Kingman Reef also was listed as having "possibilities for use as a fleet rendezvous, as a fueling place or as a temporary anchorage." Franklin D. Roosevelt Papers as President; President's Official File 18–V: Department of the Navy: Wake, Johnston, Sand Islands and Midway, etc., 1933–1945 (Box 32) (Roosevelt Papers (Box 32)). The memorandum continued to describe the physical geography, climatology, and hydrography of Kingman Reef, based on data gathered from the U.S.S. Whippoorwill's earlier survey of the area. Secretary of the Navy letter, Oct. 16, 1934, encl. (B) at 8–12.[7] In closing, the memorandum noted: "Seaplanes can land anywhere in

---

**6.** In their various deeds and licensing agreements, the Fullard–Leo family, KRAI, KRAD, and KRE recognize that the December 29, 1934 Executive Order No. 6935 placed Kingman Reef "under the jurisdiction of the Secretary of the Navy," but do not regard the Executive Order as

asserting or placing title ownership with the Navy or any entity of the United States.

**7.** According to the record, Mr. Thurston accompanied the U.S.S. Whippoorwill on its survey trip to Kingman Reef.

the lagoon when wind is from east quadrant.... There is plenty of room for take-off in any direction. Water is rather deep for seaplane anchorages but mooring buoys can be planted." *Id.* at 12.

On November 9, 1934, nearly two months prior to the issuance of Executive Order No. 6935, R.W.S. Hill of the Office of the Legal Advisor, Department of State, wrote a letter and memorandum in which he discussed the status of the islands in the Pacific Ocean mentioned in the October 16, 1934 letter and memorandum sent by the Secretary of the Navy to President Roosevelt. Specifically regarding the status of the guano islands, the Legal Advisor at the Department of State wrote:

> This Department as well as the courts and the Attorney General have taken the position that the United States did not acquire sovereignty of, or title to, the guano islands under the Guano Islands Act of 1856.... This Department has in the past stated that it has been the course of the Department to recognize such islands only while occupied for the purpose of procuring guano, and therefore upon the cessation of such occupancy they may become open again to discovery, possession, et cetera.

Attached to Mr. Hill's November 9, 1934 letter was the memorandum, dated November 7, 1934, titled "Status of Certain Guano and Other Islands in the Pacific." This memorandum was issued in response to the Department of the Navy letter of October 16, 1934. Regarding issues of sovereignty, the State Department Legal Advisor stated:

> The Department has consistently taken the position with regard to these guano islands that, as stated in its letter of July 13, 1914, to Mr. H. Melville Walker (811.0141/13), "the Government of the United States claims no sovereignty or territorial rights over such island, but merely protects citizens of the United States who discover guano thereon, in the prosecution of their enterprise, which extends only to the appropriation and disposal of guano." Somewhat similar statements were contained in the Department's letter of September 2, 1882, to Mr. Brown, and numerous other communications since that date, up to and including its letter of July 1, 1934, to Mr. Vernon Le Young Ardiff (811.014/295).

In the opinion of the Attorney General of May 8, 1873 (14 Ops. Atty. Gen. 608), which relates to guano islands, he states: "Upon application to the office of the Secretary of State, I am told that it has been the course of that Department to recognize such islands only while occupied for the purpose of procuring guano, and therefore upon the cessation of such occupancy they may become open again to discovery, possession, et cetera."

. . .

The implication in the above statement, made by the Department in 1873 when the question of guano islands was a fairly fresh subject with it, would appear to be that after an American citizen had ceased to occupy an island for the purpose of obtaining guano it was no longer regarded by the Department as appertaining to the United States.

These guano islands were referred to by Chief Justice Fuller in his dissenting opinion in *Downes v. Bidwell* (182 U.S. 244, 372[-73, 21 S.Ct. 770, 45 L.Ed. 1088 (1901)]) as "*terra nullius.*"

Specifically regarding issues of title ownership to guano islands, the State Department Legal Advisor continued:

> In a letter dated July 1, 1911, addressed to the Secretary of Commerce, the Attorney General stated in part:
>
> "There is nothing in the act of Congress of August 18, 1856 [Guano Islands Act], from which it can be said that it was intended by said act to recognize title in the discoverer" (of the guano) "or to assume on behalf of the Government complete title, but on the contrary, it is clear that the act meant only to protect the discoverer for the purpose of obtaining and shipping guano and that the Guano Islands 'were in no sense to become part of the territorial domain of the United States.'"

Toward the end of the memorandum and in specific reference to Kingman Reef, Mr. Hill reiterated that "it seems almost certain that no guano was ever removed from the Island."

In the immediately preceding paragraphs, the State Department Legal Advisor continued:

On July 15, 1922, the Island of Palmyra Copra Company, a Hawaiian Corporation, notified the State Department that it had annexed Kingman's Reef in the name of the United States and for its own use on May 10, 1922.

No other action appears to have been taken with respect to the incorporation of the Island into the territory of Hawaii or the United States. While it does not appear that any other country has claimed Kingman's Reef, it might be well for this Government to take some affirmative action to show definitively that it is a part of the territory of the United States. The mere mention of it in an Act of Congress as American territory would be sufficient.

On December 13, 1934, just two weeks prior to the issuance of Executive Order No. 6935, the Secretary of the Navy transmitted to President Roosevelt a "draft of [the] executive order placing Wake Island, Kingman Reef and Johnston and Sand Islands under the control and jurisdiction of the Secretary of the Navy." Secretary of the Navy letter, Dec. 12, 1934, at 1. As to the underlying purpose of the proposed executive order, the Secretary of the Navy wrote:

There are at present on hand a number of requests from airline systems for the use of portions of the above named islands . . . for the establishment and operation of commercial trans-ocean airline facilities. It is felt that greater progress will be made by the airline systems and greater satisfaction will be obtained by the Government if all of the areas involved are placed under one and the same department. . . . [I]t is considered that the interests of the Government would be best served by also placing under the control and jurisdiction of the Navy Department the [ ] areas that are desired to be occupied by trans-ocean airline facilities, viz: Wake Island, Kingman Reef and Johnston and Sand Islands.

With regard to Kingman Reef, the Secretary of the Navy wrote that Kingman Reef was "first seen and reported by Captain Kingman on the American ship SHOOTING STAR. It was claimed for the United States by L.A. Thurston of Honolulu in 1922 and it is recognized by the Department of State as being under the sovereignty of the United States." *Id.* In closing, the Secretary wrote, regarding the President's authority to issue the Executive Order, that the "sovereignty of the United States over said islands is well recognized and further inquiry respecting the questions of title and jurisdiction need not be made." *Id.* at 2–3. It appears, however, that the Secretary did not provide any additional information as to the history of Kingman Reef and did not make any reference to Kingman Reef as a guano island. Instead, through a preceding reference, he apparently based the claim of the United States for sovereignty on the actions taken in 1922 by plaintiff KRAI's predecessors-in-interest. *See id.* at 2. The Secretary did not assert that the United States held fee title ownership to Kingman Reef.

As noted above, on December 29, 1934, President Franklin D. Roosevelt issued Executive Order 6935, which "reserved, set aside, and placed [Kingman Reef] under the control and jurisdiction of the Secretary of the Navy for administrative purposes," subject also to the use of the Department of Agriculture as a refuge and breeding ground for nature birds. Subsequently, on December 31, 1934, President Roosevelt sent a memorandum to the Secretary of the Navy in which he stated:

In relation to Navy jurisdiction over these Pacific Islands, I think it is highly adviseable [sic] that the Navy exercise that jurisdiction in some tangible form at the earliest possible moment. You might consult with the State Department and ask them if the establishment of a small supply base or the fixing up of a landing place would be adequate to sustain sovereignty.

Roosevelt Papers (Box 32): Memorandum of December 31, 1934.

**Pan American Airways 1937–1938 Flights to Kingman Reef**

An apparent reason for its issuance of Executive Order No. 6935 was to place Kingman Reef under United States sovereignty and naval jurisdiction, so that the island

could be used for seaplane travel. To that end, in the mid–1930s, Pan American Airways (Pan Am) began to "look aggressively to the Pacific for its further expansion" and was granted permission to fly its sea planes to New Zealand if it could do so no later than the end of 1936. While planning the initial test flights, Pan Am chose Kingman Reef as the overnight stopover point between Honolulu [Hawaii] and Pago Pago [American Samoa] because it formed a mid-ocean lagoon suitable for a seaplane to land. In 1935, Pan Am's representative, Harold Gatty, visited Kingman Reef, where he "built a small monument on the speck of dry land" and stationed a supply boat there to service the Pan Am Clipper seaplane. Pan Am's first survey, round-trip flight to Kingman Reef left Honolulu on March 23, 1937 and, after an "overnight stay at Kingman Reef, the Clipper flew on to Pago Pago." The Clipper returned to Kingman Reef on April 8, 1937 and continued its flight to Honolulu on April 9, 1937.

The Clipper made a second round-trip flight in late 1937. Outbound, it landed at Kingman Reef on December 23, 1937 and flew onto Pago Pago on December 24, 1937. Inbound, the Clipper returned to Kingman Reef on January 2, 1938 and flew onto Honolulu on January 3, 1938. Pan Am's third and final Pacific flight via Kingman Reef was in early 1938. The Clipper flew from Honolulu to Kingman Reef on January 9, 1938 and after an overnight stay, it flew on to Pago Pago on January 10, 1938. After an early morning take off from Pago Pago bound for New Zealand on January 11, 1938, the Clipper exploded and was lost at sea. "After the loss of the Samoan Clipper, the dangerous route through Kingman Reef and American Samoa was abandoned."

On April 20, 1937, in correspondence, Leslie and Ellen Fullard–Leo wrote to the Hawaii congressional delegate in Washington, D.C., Samuel Wilder King, regarding the Pan Am landings at Kingman Reef. The Fullard–Leos wrote that Kingman Reef's "ownership presumably rests with the State or Navy Department, since by one of these, use of it has been given to Pan–American Airways, and has on two occasions been used during their trial flight this month to Auckland,

N.Z." The Fullard–Leos also requested that Mr. King "interest[ ] the Government in the purchase of the Palmyra group" for the then materializing air "route to the South Pacific."

Moreover, specifically regarding Kingman Reef, the Fullard–Leos stated: "Not only did we secure this wonderful harbor for the United States but really prevented the same being annexed for a foreign power. Meanwhile we are still paying taxes on Kingman's which is included in the Palmyra nominal assessment." In closing, the Fullard–Leos presented a claim for $40,000.00, including accrued interest, to cover the costs incurred in "annexing Kingman's Reef" by sending their boat to Kingman Reef three times, as well as to cover the tax payments that the Fullard–Leos made during the 15–year period from 1922 to 1937. Although the Fullard–Leos sought first to pursue their claim through their congressional delegate, they did not rule out the possibility of making a "formal claim through legal channels," for which the award of anticipated legal fees would be requested.

On October 15, 1937, The Judge Advocate General of the Navy (Navy TJAG) wrote to the Commandant, Fourteenth Naval District, United States Navy. In his letter, the Navy TJAG requested "information as to the private ownership of or interest in Kingman Reef and Palmyra Island as disclosed by the records of the Fourteenth Naval District," along with "documents bearing thereon." In response, on December 6, 1937, the Commandant wrote to the Navy TJAG on the subject of "Kingman Reef and Palmyra Island in the Pacific Ocean—Private Ownership." The Commandant recited the history of Kingman Reef, starting first with the 1922 annexation by Mr. Thurston and the Copra Co. Notably, he made no reference to any events regarding Kingman Reef prior to 1922. The Commandant then wrote that receipt of the 1922 letters sent by Ellen Fullard–Leo to the Secretary of State regarding the Copra Co.'s annexation of Kingman Reef was "acknowledged by the Secretary of State but no mention was made of the [Copra Co.'s] claim to Kingman Reef for its own use."

However, in the same December 6, 1937 letter, the Commandant further noted that

the "Territory of Hawaii has continued to collect taxes on Kingman Reef from Ellen and Leslie Fullard–Leo as the alleged owners of Palmyra Island and Kingman Reef since 1923, although Kingman Reef is not accepted as a part of the Territory of Hawaii." In closing, the Commandant stated: "It is understood that Mr. L. Fullard–Leo is preparing to submit a claim for ownership to Kingman Reef in the near future, based upon the original claim of the [Copra Co.], which was financed largely by himself and his wife." Subsequently, on February 11, 1938, the Navy TJAG acknowledged receipt of the Commandant's letter of December 6, 1937, stating, "[t]he information contained therein will be placed on file for future reference in the event a claim is made for ownership by private parties. No such claim has been filed with the Navy Department to date."

A few months later, on January 25, 1938, Mr. Townsend and Mr. Lewis, attorneys for the Fullard–Leo family, sent a letter to the Secretary of State regarding Ellen Fullard–Leo's "interest ... in the island known as Kingman's Reef...." On February 12, 1938, the Department of State responded, informing Mr. Townsend and Mr. Lewis that the letter was "transmitted to the Secretary of the Navy for his information in the matter." Subsequently, on March 29, 1938, Mr. Townsend and Mr. Lewis wrote directly to the Secretary of the Navy to discuss the Fullard–Leo family's claim of fee title ownership in Kingman Reef. In that letter, Mr. Townsend and Mr. Lewis wrote:

> As indicated in our letter of January 25th to the Secretary of State, it would seem that, as a result of the Executive Order of December 29, 1934, the Secretary of the Navy apparently concluded that the Department of State had denied the existence of the private property interests in Kingman's Reef claimed by Mrs. Ellen Fullard–Leo. We trust that the letters now in your possession will clarify the position and remove any question as to Mrs. Fullard–Leo's legal rights, which we propose to protect, so far as possible, by appropriate legal proceedings. It seems unnecessary to restate the costs incurred by Mrs. Fullard–Leo in connection with the annexation of Kingman's Reef for and in behalf of the

United States, or to recount the steps taken by her to establish her presently existing legal rights to the private property interests in the atoll.

On April 26, 1938, the Navy TJAG, by direction of the Secretary of Navy, responded to Mr. Townsend and Mr. Lewis' letter of March 29, 1938. In that letter, the Navy TJAG acknowledged that the Fullard–Leo family's previous correspondence with the Department of State "indicates that the claim of title of Mrs. Fullard–Leo is based" on Mr. Thurston's alleged 1922 annexation of Kingman Reef to the United States and the Copra Co. However, the Navy TJAG went on to dispute and expressly reject the Fullard–Leo family's claim of ownership, stating:

> The records show that Kingman Reef, otherwise known as 'Dangers Rock,' is a bonded guano island, it having been listed by affidavit of Captain W.W. Taylor on February 12, 1858, and his right through several assignments, were transferred to the United States Guano Company, and the island was bonded on February 8, 1860 (Moore's *Digest of International Law*, Vol. 1, pp. 667–668). It will be noted that the island, including its reefs and tide and submerged lands, was under the control and jurisdiction of the United States long before the claim of Mrs. Fullard–Leo arose, and by Executive Order No. 6935, dated December 29, 1934, it was placed under the control and jurisdiction of the Navy Department. Under the circumstances, the showing made is not sufficient to uphold the claim of Mrs. Fullard–Leo.

Following this year long series of correspondence between the Fullard–Leo family and then on their behalf with the federal government, contact between the Fullard–Leo family and the federal government regarding Kingman Reef appears to have ceased for several decades. The record does not appear to offer evidence of correspondence or other contact between the Fullard–Leo family and the federal government regarding Kingman Reef from 1938 to 1991.

**President Roosevelt's 1941 Executive Orders**

On February 14, 1941, President Roosevelt issued Executive Order No. 8682, as amend-

674

ed by Executive Order No. 8729, dated April 2, 1941, which "established and reserved as naval defensive sea areas for the purposes of national defense," the "Kingman Reef Naval Defensive Sea Area" and the "Kingman Reef Naval Airspace Reservation" by which the airspace over said territorial waters and islands were reserved as "naval airspace ... for the purpose of national defense." Exec. Order No. 8682, 6 Fed.Reg. 1015 (Feb. 14, 1941). In sum, Executive Order No. 8682 established Naval Defensive Sea Areas over the "territorial waters between the extreme high-water marks in the three-mile marine boundaries" surrounding Kingman Reef and Palmyra, Johnston, Midway, and Wake Islands in the Pacific Ocean, as well as Naval Airspace Reservations of the "airspaces over the said territorial waters and islands ... for purposes of national defense...." Executive Order 8682 further stated:

> At no time shall any person, other than persons on public vessels of the United States, enter any of the naval defensive sea areas herein set apart and reserved, nor shall any vessel or other craft, other than public vessels of the United States, be navigated into any of said areas, unless authorized by the Secretary of the Navy. At no time shall any aircraft, other than public aircraft of the United States, be navigated into any of the naval airspace reservations herein set apart and reserved, unless authorized by the Secretary of the Navy.

Executive Order No. 8729 amended the phrase the "territorial waters between the extreme high-water marks in the three-mile marine boundaries," in a number of Executive Orders, including Executive Order No. 8682. Executive Order No. 8729 stated the phrase "is hereby corrected to read 'the territorial waters between the extreme high-water marks and the three-mile marine boundaries.'" Exec. Order No. 8729, 6 Fed. Reg. 1791 (Apr. 2, 1941). Neither Executive Order No. 8682 nor Executive Order No. 8729 addressed issues of title or ownership of Kingman Reef.

A February 7, 1941 letter from the Bureau of the Budget, Executive Office of the President, to the Secretary of the Navy, regarding the proposed Executive Order No. 8682, stated that the Secretary of the Interior, "assumes that proper provision will be made under the authority given the Secretary of the Navy so as to permit bona fide residents of the areas reasonable means of transportation and communication to and from the islands." Moreover, the letter recommended that the Navy, in a manner consistent with the proposed Executive Order No. 8682, permit travel to and from Kiska Island by the natives for the raising of blue foxes and use of Kaneohe Bay, Hawaii by the local fishing industry.

Subsequently, on March 15, 1941, the Chief of Naval Operations, United States Navy (CNO), wrote to the Navy TJAG. The CNO stated that, in preparing administrative regulations for their respective Naval Defensive Sea Areas, "commandant[s] will be invited to the necessity for the minimum of interference with vital industries and vested interests." Moreover, in an April 18, 1941 letter to the Commandant, Thirteenth Naval District, regarding the "Administration of Naval Defensive Sea Areas and Air Space Reservations," the CNO stated:

> In the administration of these areas, it is not the intention of the Chief of Naval Operations to hamper the commandant by unnecessary regulation. The object of the executive order was to give the commandant necessary authority to control subversive activities and safeguard the national defense. The amount of control necessary can best be judged by the commandant or his representative in command locally.

Decades later, on July 14, 1976, the CNO suspended the Naval Airspace Reservation over Kingman Reef. See 32 C.F.R. § 761.4(d) (2012). Additionally, the CNO suspended the Naval Defensive Sea Area around Kingman Reef, except for the entry of foreign flag ships and nationals. 41 Fed.Reg. 28,957 (Jul. 14, 1976). However, these areas were made "subject to reinstatement without notice at any time when the purposes of national defense may require." 32 C.F.R. § 761.4(d).

Despite the issuance of the Executive Orders in 1934 and 1941, plaintiffs allege that no restrictions regarding Kingman Reef were

ever implemented. To that end, Mr. Savio, in a sworn declaration, stated:

> At no time has the government ever restricted me from entering Kingman Reef itself, its airspace or surrounding waters, nor has the government ever indicated to me that I, acting as the Fullard–Leo family's agent, was not authorized or able to sell, convey or transfer any of its interest in Kingman Reef.

Similarly, brothers Ainsley and Dudley Fullard–Leo, in sworn declarations, each stated:

> At no time have I ever been physically restricted from entering Kingman Reef, nor has the government demonstrated to me, until the taking in January 2001, that the Fullard–Leo family and/or Kingman Reef Atoll Investments, L.L.C. were unable to sell, convey or transfer any of its interest in Kingman Reef.[8]

### Kingman Reef from 1938–1990s

On November 10, 1952, the Commander in Chief, United States Pacific Fleet, Pearl Harbor, Hawaii issued CINCPACFLT Instruction 5521.1A, which "set[ ] forth detailed procedures for obtaining and [sic] information on travel clearances required for" over fifteen islands and other land masses, including Kingman Reef, Japan, Philippine Islands, Hong Kong, and Countries and Territories in or bordering the Pacific Area. Instruction 5521.1A set forth procedures and applications by which both United States citizens and foreign nationals, who were not United States military personnel, could receive per-

mission to access such islands and land masses. With regard to Kingman Reef in particular, Instruction 5521.1A first referred to Executive Order 8682 of February 14, 1941 and explained its contents. Second, Instruction 5521.1A stated that it is necessary to "obtain security clearance" to access Kingman Reef through an established procedure,[9] but further noted that "Kingman Reef is not regularly inhabited."

Subsequently, on November 12, 1963, the Office of the Chief of Naval Operations issued "Regulations Governing Issuance of Entry Authorizations," OPNAV Instruction 5500.11C.[10] These regulations reiterated that the Kingman Reef Naval Defensive Sea Area and Naval Airspace Reservation were established by Executive Order 8682 of February 14, 1941. The Navy regulation also stated that Executive Order 6935 of December 19, 1934 placed Kingman Reef and its appurtenant reefs and territorial waters under the control and jurisdiction of the Secretary of the Navy for administrative purposes. Regarding entry authorizations, The Navy regulation stated:

> Entry authorizations may be issued only after an Entry Control Commander ... has determined that the presence of the person, ship, or aircraft will not, under existing or reasonably foreseeable future conditions, jeopardize the efficiency, capability or effectiveness of any military installation located within or contiguous to a defense area.

mission to enter such areas, the Navy required the party seeking entry to submit to a background check and provide relevant background information, including name, address, date and place of birth, alien registration number or proof of citizenship, and employment information, as well as the duration and purpose of the proposed visit.

---

8. In his deposition of April 11, 2007 before the United States District Court for the District of Hawaii, Dudley Fullard–Leo stated that he had never physically been on Kingman Reef and had never visited it by ship, but had flown over it twice.

9. Instruction 5521.1A stated that the requirements to gain permission to access Guam and the Trust Territory of the Pacific apply also to gain access to Kingman Reef. In order to access Guam and the Trust Territory, security clearance is necessary for all entrants, except for military and civilian personnel of the United States Armed Forces and their dependants, civilians under contract with the armed forces, travelers in transit without stop-over, permanent residents of the trust territories traveling within the Territory or to Guam, and permanent residents of Guam. To receive a security clearance and per-

10. Defendant, in the Hawaii quiet title action, *Kingman Reef Atoll Investments, L.L.C. v. United States*, 545 F.Supp.2d 1103, included updated copies of OPNAV 5500.11C, listed as OPNAVINST 5500.11D of January 31, 1975 and OPNAVINST 5500.11E of September 18, 1990. All versions of OPNAV Instruction 5500.11 presented to the court contain substantially the same information regarding entry authorization to the Navy defensive zones, including Kingman Reef.

. . .

Requests for entry authorizations will be evaluated and adjudged as to whether the entry at the time and for the purpose stated will or will not be inimical to the purposes of national defense.

On June 21, 1973, A.W. McKelvey wrote to the Honorable Hiram Fong, United States Senator, in which he stated that it has come to his "attention that the Kingman Reef is under the control of the United States Navy." In order to establish a commercial fishing operation in the Line Islands, Mr. McKelvey sought information regarding "who to contact in the Navy Department in order to obtain permission to fish on and about Kingman Reef." In response, Senator Fong directed Mr. McKelvey to Joseph Samartino, Director, Real Estate Division, Commander Naval Facilities Engineering Command, Headquarters, Commander in Chief. The parties have neither made reference to, nor presented further documentation to the court, regarding contact between Mr. McKelvey and the Navy concerning Kingman Reef.

On August 2, 1973, the Navy issued a memorandum in which it stated that if permission to enter Kingman Reef is to be granted, then it suggests specifying that there be "[p]ole and/or net fishing only. No permanent structures on atoll. Effect necessary [Coast Guard] + Navy notification."

**The Status of Kingman Reef During the 1990s**

The record does not reveal evidence of contact between the Fullard–Leo family and the federal government regarding Kingman Reef from 1938 to the early 1990s. On January 23, 1991, the Commander in Chief, United States Pacific Fleet, Pearl Harbor, Hawaii issued CINCPACFLTINST 5450.74C, which instructed the Commander of the Naval Base at Pearl Harbor to "[s]erve as Entry Control Commander with authority to approve or disapprove . . . authorization for all persons, ships, and aircraft to enter Kingman Reef."

On July 26, 1991, TNC, a private nature preservation organization, and the FWS met with Peter Savio, agent for the Fullard–Leo family and member/manager of KRAD, to discuss the sale and development of Palmyra Atoll and Kingman Reef. In an August 19, 1991 memorandum listing the minutes from the July 26, 1991 meeting, James E. Maragos, Director, Conservation Science, of TNC's Pacific Regional Office, wrote that the buy-out option of the Fullard–Leo family's ownership interest in Kingman Reef proposed by Mr. Savio, who also informed the TNC of the Fullard–Leo family's ownership claim, should be seriously considered. Mr. Maragos further noted: "Transfer of Kingman Reef by the owners to the USFWS could also serve as compensation or mitigation for other impacts, and the USFWS is keenly interested in Kingman."

Although the defendant asserts that TNC was not acting as defendant's agent in any dealings it had or may have had with Mr. Savio or others, representatives from the FWS were present at the July 26, 1991 meeting and were included on the August 19, 1991 memorandum. Additionally, in a sworn declaration, Mr. Savio stated:

I specifically recall that during that meeting the U.S. Fish and Wildlife Service ("FWS") stated that it was keenly interested in Kingman Reef, and that we discussed whether the Fullard–Leo family would be interested in selling both Palmyra Atoll and Kingman Reef to TNC or the government. No one at the meeting questioned the Fullard–Leo family's legal title to Kingman Reef or suggested that the government owned Kingman Reef.

Additionally, in the August 19, 1991 memorandum, TNC reiterated Mr. Savio's position regarding the relationship between the Fullard–Leo family and the federal government:

The owners are nervous about collaborating with the federal government due to previous misfortunes. . . . If Savio pulls out of the project, then the owners would not want USFWS/TNC as partner for further attempts at development and conservation. The owners are concerned that the federal government may try to condemn [Palmyra Atoll] once the feds have a foothold. . . .

Additional evidence of subsequent discussions specifically regarding Kingman Reef in the years immediately following the 1991 meeting between Mr. Savio, TNC and FWS,

was not presented to the court. It appears from the record that discussions regarding the conservation of Kingman Reef actively resumed in 1997.

On December 15, 1992, Lieutenant Commander Rick Russell, United States Navy, Pearl Harbor, contacted P. Ha and Andy Yuen at the FWS regarding the granting of access to Kingman Reef. The record of the telephone conversation stated:

Lt. Commander Russell called to let us know that he is the person to talk to regarding permission to go to Kingman Reef.

He called with respect to the Ham Radio expedition to Kingman that is being planned. There seems to have been a mixup with the information about who has jurisdiction over Kingman Reef. It is not Peter Savio. The Navy (COMNAVBASE Pearl Harbor) has administrative jurisdiction over Kingman Reef by delegated authority under [Executive Order] 6935[,] 29 December 1934. (Kingman is "reserved reefs"). Lt. Commander Russell just wanted to clarify the issue. He will call Peter Savio to inform him.

The parties neither referenced, nor provided the court with documentation of, further contact between Commander Russell, Mr. Savio, Mr. Ha or Mr. Yuen regarding this particular issue. Specifically, the parties have neither alleged nor presented evidence to the court that Commander Russell actually contacted Mr. Savio to restrict Mr. Savio from granting access to Kingman Reef to third parties.

On March 7, 1994, John D. Clouse contacted the Commander of the Pearl Harbor Naval Base, seeking entry and transportation to Kingman Reef. In response, on March 18, 1994, Commander Russell informed Mr. Clouse that the Navy could not provide transportation to Kingman Reef. However, Mr. Clouse was informed that he could enter Kingman Reef, by his own boat charter, after Commander Russell processed the attached form application (i.e., permit) for entry of ships into areas within the jurisdiction of the Navy at Pearl Harbor. The parties neither referenced nor provided the court with docu-

mentation of further contact between Mr. Clouse and the Navy.

On May 28 and 30, 1996, Michal Mickelwait of the Honolulu Sailing Company wrote the Commander of the Pearl Harbor Naval Base, on behalf of a group of travelers seeking to literally set foot on every territory and island group in the Pacific. Mr. Mickelwait specifically sought permission for the group to enter Kingman Reef. On May 18, 1996, G.D. Jensen, Captain, United States Navy responded to Mr. Mickelwait's request in a letter which granted permission for the group to enter Kingman Reef, during daylight hours, for a maximum duration of four hours. The parties did not present the court with evidence that Mr. Mickelwait's group ever actually entered Kingman Reef.

Similarly, on October 6, 2000, P. Borkowski, Lieutenant Commander, United States Navy wrote a letter to David Johnson, granting permission for the ship, M/V Machias, to enter Kingman Reef from October 20, 2000 until November 1, 2000 to "conduct natural history surveys and to engage in amateur radio activities." The record does not contain evidence that the M/V Machias actually entered Kingman Reef.

It also appears that between 1991 and 1997 the Fullard–Leo family attempted to sell to or jointly develop, Kingman Reef, with the State of Hawaii or City of Honolulu. To that end, on August 4, 1994, Leigh–Wai Doo, Councilmember, City Council of the City and County of Honolulu, wrote to Ainsley and Dudley Fullard–Leo, as well as to Peter Savio, thanking them for

sharing with me your time and openness of Hawaii government acquisition of Palmyra Atoll and Kingman Reef. I continue in my strong belief, desire and effort to see Hawaii State or Honolulu City and County acquisition, or at least jointly plan with you[,] Palmyra Atoll and the Kingman Reef. In the coming five months remaining in my City Council term I hope we achieve success to these ends.

Plaintiffs allege that this letter is evidence that the Hawaii state government recognized the validity of the Fullard–Leo family's claim of fee title ownership in Kingman Reef.

### The Establishment of the Kingman Reef NWR

In the late 1990s, the federal government appears to have renewed its interest in Kingman Reef. Beginning in October 1997, the FWS began to develop and issue proposals regarding the proposed establishment of the Kingman Reef NWR. On October 2, 1997, Jamie Rappaport Clark, then Director of the FWS granted approval to the Regional Director, Region 1, FWS to "proceed with detailed planning" on the establishment of the Palmyra Atoll and Kingman Reef NWRs. Attached to that memorandum was an August 1997 Preliminary Project Proposal, which noted:

[a] Explorers wishing to visit Kingman Reef must secure permission from the Fullard–Leo family and the U.S. Coast Guard.

[b] Kingman Reef was annexed on behalf of the United States in 1922, by the Palmyra Copra Company (Fullard–Leo family), and the family claims ownership. It is an unincorporated U.S. possession administered by the U.S. Department of the Navy. The Service [FWS] is proposing to study fee title acquisition of Kingman Reef from the center of the atoll to the 3–nautical mile limit.

[c] The Landowners are reportedly willing to sell their lands to prevent heirs from acquiring a large inheritance tax debt.

[d] [T]he price for fee title to Kingman Reef is unknown. Due to the negligible commercial real estate value, it might be possible to include it in the purchase price negotiated for Palmyra.

Next, on October 3, 1997, Robert P. Smith, Pacific Islands Manager for the FWS sent a handwritten facsimile to Mr. Savio in which he stated:

Peter, the attached represents approval from our director in Washington, Jamie Clark, to proceed with detailed planning necessary for our acquisition. Note that we desire to acquire both Palmyra and Kingman, if that is the sellers' desire. I will transmit this to Col. Ralph Graves of the Corps with a cover letter emphasizing the need to do clean-up work [at Palmyra Atoll].

Concurrently, on October 3, 1997, Mr. Smith also wrote a letter to Lieutenant Colonel Ralph H. Graves, Honolulu District Engineer, United States Army Corps of Engineers, Fort Shafter, Hawaii. Mr. Smith noted that the enclosed memorandum from Mr. Clark gave approval for the FWS to "begin detailed planning toward (hopefully) acquisition of Palmyra Atoll and Kingman Reef as units of the National Wildlife Refuge System." Mr. Smith continued to write that the FWS is working closely with Mr. Savio, "a local realtor who represents the interests of the majority owners[,]" as well as TNC, and he "at this point foresee[s] TNC actually tendering an offer to buy the property. If that is successful, the Service will repay TNC in the future with dollars appropriated by Congress through the Land and Water Conservation Fund."

Regarding the defendant's alleged recognition of fee title ownership in the Fullard–Leo family, Mr. Smith stated, in an April 2, 2007 deposition in *Kingman Reef Atoll Investments, L.L.C. v. United States*, 545 F.Supp.2d 1103, that "[f]rom '91 until certainly '97 . . . certainly [he] believed that the Fullard–Leo family owned Kingman Reef," and that no one in his presence stated that the Fullard–Leo family did not own Kingman Reef. However, Mr. Smith indicated that on a second expedition to Palmyra Atoll, in 1998, he had changed his position regarding the claim of fee title ownership by the Fullard–Leo family in Kingman Reef. Mr. Smith stated that between 1997 and 1998:

The Nature Conservancy's attorney, Suzanne Case, had done extensive research on the ownership of Kingman; because [Mr. Smith] was then and probably continued to be : . . . a cheerleader for getting both properties and both nearby marine environments. . . . [Ms. Case's] research revealed that the Fullard–Leo family, at least in her view, did not own Kingman Reef.

Although without offering any additional foundation for his conclusions, Mr. Smith further stated that following the 1998 expedition, the Realty Division at FWS decided that, "in the view of the government," Ms. Case's research was correct and that the

Fullard–Leo family did not hold title to Kingman Reef.

An October 17, 1997 report issued by NOAA, however, acknowledged the ownership by the Fullard–Leo family of Kingman Reef:

> The Fullard–Leo family owns Palmyra Island and Kingman Reef, and may claim ownership or jurisdiction over ocean resources and/or submerged lands seaward of the low-water mark.

> The exact extent of the Fullard–Leo claims is not clear, probably extending to the lagoons and reefs surrounding the islands, and perhaps extending to the "territorial" waters. Federal submerged lands around these areas were not conveyed to the Fullard–Leo family. It is the position of the Federal Government that the EEZ [Exclusive Economic Zone] around Palmyra and Kingman extends to the low-water mark.[11]

Further, in his November 1997 "Report to the Chairman, Committee on Resources, House of Representatives, United States Insular Areas, Application of the United States Constitution," the Associate General Counsel of the United States General Accounting Office (GAO, now Government Accountability Office), the investigative arm of Congress, specifically noted that Kingman Reef had been claimed by the Fullard–Leo family. *Id.* at 9.[12] First, the GAO noted that seven of the nine United States insular areas,[13] including Kingman Reef, were initially claimed for the United States under the Guano Islands Act of 1856, codified at 48 U.S.C. §§ 1411–1419. Report to the Chairman, Committee on Resources, House of Representatives, United States Insular Areas, Application of the United States Constitution, at 10. However, the GAO stated that, "[a]lthough claims were made to Palmyra Atoll and Kingman Reef under the act, the presence of guano in either area is doubtful." *Id.* at 39 (citing Legal Advisor's Office, U.S. Department of State, *The Sovereignty of Islands Claimed Under the Guano Act and of the Northwest and Hawaiian Islands, Midway, and Wake* at 612–15, 624–25 (1933)). In fact, the GAO reiterated that "Palmyra previously had been claimed in 1860 under the Guano Islands Act. The claim, however, does not appear to have been accepted as valid. It is unlikely that the claimant landed on the island or that there was even any guano on it." Report to the Chairman, Committee on Resources, House of Representatives, United States Insular Areas, Application of the United States Constitution at 41, n. 9 (citing *The Sovereignty of Islands Claimed Under the Guano Act and of the Northwest and Hawaiian Islands, Midway, and Wake* at 612–15, 875).

With specific regard to Kingman Reef, the GAO report concluded:

> First discovered in 1798 by an American whaler, Kingman Reef was claimed in 1860 by the U.S. Guano Company, although

---

11. Defendant admits that the August 1997, October 2 and October 3, 1997 reports, produced by FWS, referenced above, are accurately quoted. However, defendant argues that any "preliminary" reports, documents or letters, including a 1997 proposal to study fee title acquisition of Kingman Reef that FWS issued in connection with the process for determining whether to designate Kingman Reef as a National Wildlife Refuge must be interpreted in light of subsequent investigations undertaken in connection with that determination and the issuance of any final reports and decisions regarding Kingman Reef. Defendant further asserts that subsequent investigations confirmed that the United States was the owner of Kingman Reef and that the claims of private ownership asserted by the Fullard–Leo family and related entities were invalid. Defendant also has stated that the author of the October 17, 1997 NOAA report was not charged with investigating or otherwise assessing title to Kingman Reef and had no authority to claim or disclaim title to federal property, and the NOAA statement that the Fullard–Leo family owns Kingman Reef is incorrect.

12. The draft of the GAO report was submitted to the DOI, Justice and State for comment. "Each of these agencies and offices generally agreed with the information and issues discussed in [the] draft report and offered technical comments, which [were] incorporated in the report as appropriate." Specifically, on July 3, 1997, the DOI "commend[ed the GAO] on the report's content and accuracy." The GAO "modified the report to reflect the Department of the Interior's comments," including those from the Office of Insular Affairs and the FWS.

13. The nine small insular areas are Palmyra Atoll, Navassa Island, Johnston Atoll, Baker Island, Howland Island, Jarvis Island, Kingman Reef, Midway Atoll, and Wake Atoll. All islands except for Midway and Wake Atolls were claimed under the Guano Islands Act.

there is no evidence that guano existed or was ever mined there. The atoll was claimed again in 1922 by Lorrin Thurston on behalf of the Palmyra Copra Company for use as a fishing base. The State Department concluded in 1933, in a study of islands claimed under the Guano Islands Act, that claims made under the act to Kingman Reef were not valid. However, an American had initially discovered Kingman and no other nation claimed it. In 1934, President Franklin Roosevelt placed the reef under the control of the Navy, formally asserting American rights to it. During World War II, Kingman was included in a naval defensive area established by President Roosevelt. In 1950, the Congress enacted a law making Kingman Reef, along with several other insular areas, subject to the jurisdiction of the U.S. District Court in Honolulu for purposes of any criminal or civil cases that might arise there.

*Id.* at 57–58.

Regarding the Fullard–Leo family's claim of fee title ownership to Kingman Reef, the GAO noted that although Mr. Savio informed the GAO that the Copra Co. ceded all rights to Kingman Reef to the Fullard–Leo family in 1922, "Navy personnel searching Hawaiian land records in 1986 were unable to locate a formal record of a conveyance of Kingman Reef to the Fullard–Leos," although recording may not have been required.

In an August 12, 1997 letter regarding the 1997 GAO report, however, T.E. Manase Mansur, Advisor on Insular and International Affairs to the United States House of Representatives, Committee on Resources, thanked Mr. Savio for "sending the information clarifying the rightful title of the Fullard–Leo's to Palmyra and Kingman Reef. The brief is well documented regarding the basis for clear title to the entire area of Palmyra and Kingman, including surrounding reefs." Mr. Mansur continued:

The House of Representatives has designated the Committee with primary jurisdiction for all territories. There is considerable interest in Congress in insuring that private property rights of U.S. citizens are protected. That certainly includes the

Fullard–Leo's rights to Palmyra and Kingman currently and under any future legislation which would affect the formal jurisdiction of these islands.

A few years later, on October 26, 2000, the United States Senate Committee on Appropriations sent letters to the Secretary of the Department of the Interior, Bruce Babbitt, and the Secretary of the Department of Agriculture, Daniel Glickman, informing them that Congress provided an "additional $179 million for high priority land acquisitions," $130 million of which was provided to DOI pursuant to the "Department of the Interior and Related Agencies Appropriations Act, 2001." Pub.L. No. 106–291, 114 Stat. 922 (2000). Apparently, DOI had requested $8.25 million for the purchase of "Palmyra Atoll/Kingman Reef (HI)."

Earlier, on October 6, 1999, Michael Killian, United States Navy, sent an email to Steven M. Dong, United States Navy, regarding information requested on Kingman Reef by the Deputy Assistant Secretary of the Navy, W.J. Cassidy. In his response, Mr. Killian wrote that:

Navy was designated the responsible federal agency to "own" Kingman Reef for lack of any other appropriate interested agencies. We are stuck with it. If now, we have another interested agency such as USFWS, then Navy should have no problem transferring custodial responsibility to DOI. As long as it is in federal ownership, Navy can deal with national security concerns involving the island. I am unaware of any Navy usage in recent history. It may have been occupied during WWII.

Subsequently, a March 30, 2000, Briefing Statement prepared for the Director of FWS, titled "Kingman Reef Ownership Status and Federal Jurisdictions," stated:

Kingman Reef is an unorganized and unincorporated U.S. possession. The U.S. acquired sovereignty over Kingman Reef pursuant to the Guano Act of 1856. Fee title interest rests with the Federal Sovereign. It is currently under the jurisdiction of the U.S. Navy.

The Fullard–Leo family is claiming private ownership. In 1922, the American flag

was hoisted over Kingman Reef at the request of the Fullard–Leo family for the purpose of taking formal possession. This is the same family that owns Palmyra Atoll, and whose ownership was confirmed by the Supreme Court decision, *United States v. Fullard–Leo*, 331 U.S. 256 [67 S.Ct. 1287, 91 L.Ed. 1474] (1947)—the case did not address Kingman Reef. Recently, The Nature Conservancy obtained a purchase agreement for Palmyra Atoll.

People wishing to visit Kingman Reef must secure permission from the Fullard–Leo family. However, the U.S. government does not recognize the family's imputed right to act in this manner.

In closing, the Briefing Statement observed, as an ongoing concern, "the private ownership claims made by the Fullard–Leo family, though unsubstantiated, may need to be resolved...."

Subsequently, on August 25, 2000, the Department of the Navy transferred "[c]ontrol over and administrative jurisdiction of Kingman Reef, together with all reefs surrounding such island" to the DOI. At the time, the Navy determined that Kingman Reef was "excess" to Department of Defense requirements and that the property was "suitable for transfer to another Federal agency." On September 1, 2000, the DOI acknowledged the acceptance of transfer, subject to President Roosevelt's Executive Orders of 1934 and 1941.

Next, on December 11, 2000, FWS issued a Draft Environmental Assessment (Draft EA) and draft Conceptual Management Plan for the proposed Kingman Reef NWR. FWS also sought public comments on the proposal for a 30 day public comment period, ending January 11, 2001, following the release of the Draft EA. In the Draft EA, the FWS wrote that it "will acquire land and water interests including, but not limited to, fee title, easements, leases, and other interests. Donations of desired lands or interests are encouraged. At Kingman Reef, the interest necessary to ensure the ability to properly manage the resources is Service [FWS] ownership of the reef and associated submerged lands and waters within the proposed Refuge boundary."

In section 2.1 of the Draft EA, titled "Overview of Kingman Reef," FWS recounted the history of Kingman Reef, stating that Captain Fanning first discovered the island in 1798 and that Captain Kingman, for whom it was named, visited in 1853. *Id.* at 2–1. The FWS continued: "The U.S. annexed the reef in 1922, and in 1934 delegated jurisdiction to the Navy." *Id.* The report neither references the Guano Islands Act nor the United States' claim of ownership under the Guano Islands Act. Further, the report does not describe the manner by which the United States annexed Kingman Reef in 1922 and there is no discussion of Mr. Thurston's voyage to Kingman Reef.

In section 2.3.1 of the Draft EA, "Affected Social and Economic Environment: Ownership," the FWS wrote:

Kingman Reef is not part of any state (U.S. GAO 1997). The atoll is a United States unincorporated territory without an organic act, which is currently subject to control by the U.S. Navy. For the past 59 years, the reefs and waters of the territorial sea (within 12 nautical miles of the extreme high tide mark) have been reserved as a Naval Defensive Sea Area for the purpose of national defense (E.O. 8682 dated February 14, 1941). At such time as Kingman Reef is no longer needed for military purposes and the Navy terminates its military use, the Department of the Interior would regain full jurisdiction. The Service [FWS] would subsequently establish the Refuge through a Secretarial Order transferring jurisdiction and control from the Office of Insular Affairs to the Service [FWS].

*Id.* at 2–2.

In section 4.2.1 of the Draft EA, "Effects of the Alternatives on the Social and Economic Environment: Effects of the alternatives on ownership," regarding the alternatives of taking no action or establishing a NWR at Kingman Reef, the FWS wrote:

Both alternatives would continue the Federal ownership at Kingman Reef, and waters of the territorial seas. If the Navy extinguishes its use reservation, under [the No–Action Alternative], jurisdiction and

control would revert to the Office of Insular Affairs. If the Navy extinguishes its use reservation, under [the Refuge Alternative], Kingman Reef and the waters of the territorial sea would be transferred to the Service [FWS] for use as a National Wildlife Refuge.

*Id.* at 4–1. In Table 4–1 of the Draft EA, the FWS wrote that if the No–Action Alternative were taken, "Kingman Reef would remain under the control of the U.S. Navy," but that, if the Navy extinguished its use reservation, the Office of Insular Affairs would acquire jurisdiction. *Id.* at 4–4. But, if the NWR were established, "Kingman Reef would remain under Federal jurisdiction. If the Navy extinguished its use reservation, the Service [FWS] would acquire jurisdiction." *Id.*

In section 2.3.4 of the Draft EA, "Public use and visitation," the FWS wrote, "No permits have been recently issued by the Navy for members of the public to visit Kingman Reef." *Id.* at 2–3. The FWS also stated, at section 4.2.2, "Effects of the alternatives on land use and the local economy," that "[u]nder the No–Action [A]lternative, access to and use of Kingman Reef and its surrounding waters would continue to be regulated by the Navy and reserved for military use." *Id.* at 4–1. At section 4.2.3, FWS wrote, "at present, there is no commercial fishing authorized by the Navy." *Id.* at 4–2. At 4.2.4, FWS wrote that "[u]nder the No–Action alternative, access to Kingman Reef would continue to be restricted by the Navy within the territorial sea." *Id.*

Further, in section 3.5 of the Draft EA, the FWS stated the establishment of the NWR with a boundary of 12 nautical miles from reefs awash at mean low tide, rather than taking no action, "would allow the Service [FWS] to provide long-term conservation and management of coral reef and other marine

and terrestrial resources at Kingman Reef in perpetuity." *Id.* at 3–2, 3–4.

Following the release of the Draft EA, the FWS issued a news release, on December 12, 2000, titled "Public Comments Sought on Kingman Reef National Wildlife Refuge Proposal." The release specifically stated:

Kingman Reef is an unincorporated United States territory currently administered by the U.S. Navy. For the past 59 years, its reefs and waters have been reserved as a Naval Defensive Sea Area. The Navy is considering relinquishing its administration and returning it to the U.S. Department of the Interior.

Additionally, FWS wrote that the "Navy has not authorized fishing within its naval defensive seas, though a low level of commercial fishing for sharks and big-eye and yellow-fin tuna occurs within the 200–nautical mile Exclusive Economic Zone outside the Navy's jurisdiction."

Concurrent with the news release, a newspaper article by Harold Morse, appearing in the *Honolulu Star–Bulletin* on December 13, 2000 regarding the proposed Kingman Reef NWR, which quoted FWS officials, stated that Kingman Reef was "[f]ormally annexed by the United States in 1922, it became a U.S. Naval Reservation in 1934. Pan American World Airways used it in 1937–38 as a station for seaplanes flying between Hawaii and New Zealand." Harold Morse, Plan would turn Navy's isolated Kingman atoll into refuge, *Honolulu Star–Bulletin*, Dec. 13, 2000. The article neither made mention of the Fullard–Leo family or their claim to Kingman Reef, nor stated who or which entity held ownership to Kingman Reef. *Id.*

Following the issuance of the Draft EA and Conceptual Management Plan, plaintiffs and other interested parties requested that the time for public comment be extended by 30 days. DOI denied those requests.[14]

---

14. Parties that requested a 30 day extension to the public comment period for the proposed Kingman Reef NWR included the Fullard–Leo family, KRE, Palmyra Pacific Seafoods, L.L.C. (PPS), and the Western Pacific Regional Fishery Management Council (WPRFMC). KRE's December 19, 2000 letter to the National Wildlife Refuge System notified the organization of a potential direct and regulatory taking because

"KRE holds inchoate contractual fishing rights" within the 12 mile area extending from the low water mark at Kingman Reef, which is to be included in the NWR, and that "[e]stablishment of the refuge would also eliminate KRE's contractual rights to establish a base camp operation at the atoll." PPS, in a December 19, 2000 letter to the National Wildlife Refuge System stated that, "PPS has made a significant investment in

In their January 11, 2001 joint letter to the FWS, the Fullard–Leo family, KRAI, KRAD, KRE and Palmyra Pacific Seafoods stated:

Creation of the NWR will result in a direct taking and confiscation of private property in violation of the Fifth Amendment to the United States Constitution.... The EA, allegedly supporting the creation of the NWR, contains numerous errors, inconsistencies, omissions and misrepresentations. The EA is fatally flawed and cannot form the foundation for any final agency action. In particular, the EA conceals from the public the fact that Kingman Reef is privately owned by [the] Fullard–Leo Family and that the Fullard–Leo Family is the undisputed owner of Kingman Reef. The omission of this key fact, on its face, appears to be a bad faith effort by FWS to confiscate extremely valuable private property and push this proposed matter through on an accelerated track prior to the new Bush administration taking office.

On January 11, 2001, Carolyn Bohan, Regional Chief, National Wildlife Refuge System at FWS responded to the Fullard–Leo family and KRAI's letters of December 22, 2000 and January 4, 2001. The FWS wrote:

We made the decision not to extend the comment period because it is not the means to resolve a title issue. The end result of our planning process, if the decision is made to proceed with a refuge, is an approved refuge boundary within which we will have authority to acquire lands and waters. After a boundary is approved, title to lands can and often does change. Title issues can continue to be raised and resolved....

Your letters assert that the Fullard–Leo family are [sic] the owner of Kingman Reef. After reviewing the matter, we have found no substantiation to this claim. In 1934 and again in 1941, Kingman Reef was

reserved, set aside, and placed under the control and jurisdiction of the Department of the Navy by Executive Orders....

We are aware of no evidence that the claim the Fullard–Leo family is asserting was ever recognized by the United States. In addition, we are aware of no evidence that the Fullard–Leos have, subsequent to the 1934 Executive Order, challenged the claim of the United States to Kingman Reef.

We need adequate, documented proof of ownership.... We will acknowledge [the Fullard–Leo and KRAI] claim in the final revisions to our environmental assessment; but unless we receive acceptable, written proof of ownership, our position will continue to be that Kingman Reef is Federally owned.

On January 17, 2001, the FWS issued a Finding of No Significant Impact (FONSI), which concluded that the establishment of the Kingman Reef NWR was "not a major Federal action that will significantly affect the quality of the human environment with the meaning of section 102(2)(C) of the National Environmental Policy Act of 1969 [ (NEPA) ], as amended." National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (2006). The FONSI stated:

A private entity claimed to own title at Kingman Reef. The Service [FWS] requested that the Office of Solicitor, Department of the Interior, review the documents provided by the legal firm representing the claimants. The Solicitor believes the claim is not legally valid. Therefore, the proposed Refuge would not result in a significant adverse economic or regulatory taking on the private entity.

The FONSI continued: "The first recorded western contact at Kingman Reef was by an American seaman, Captain Fanning, in

obtaining, developing and operating its commercial fishing operation from the Palmyra Atoll and within the ocean waters around Kingman Reef. It is PPS' understanding that both Palmyra and Kingman are privately owned by the Fullard–Leo family of Hawaii. PPS is operating under rights granted to it by the Fullard–Leo family." The WPRFMC, on December 29, 2000, wrote to the FWS regarding Kingman Reef, stating that

"ownership of the island may be vigorously contested in court, and in connection with this there are other legal issues concerning rights to commercial fishing around the island." Despite the denial of the extension, KRAI and the Fullard–Leo family timely submitted their comments to FWS in letters dated December 22, 2000, January 4, 2001, and January 11, 2001.

1798. The Reef was named after Captain Kingman, who visited in 1853. The U.S. annexed the reef in 1922, and in 1934 delegated jurisdiction to the Navy." (citations omitted). The FONSI further stated:

A private entity challenged the government's claim to title at Kingman Reef. Although the Service [FWS] is aware of previous claims of ownership by a private entity, the Navy's title research in the past (reported in GAO 1997) and our own title research did not find evidence to substantiate the claim. During the public comment period, the private party provided documentation regarding their ownership claim. The documents were reviewed by the Department of the Interior's Office of the Solicitor. The Solicitor believes that the legal title holder of record is the Department of the Interior, with a reservation in favor of the U.S. Navy.

On January 18, 2001, one day after the issuance of the FONSI, Secretary of the Interior Bruce Babbitt signed Secretarial Order No. 3223. Secretarial Order No. 3223, which established the Kingman Reef National Wildlife Refuge, consisting of "emergent areas of Kingman Reef and also of its surrounding submerged lands and waters out to the twelve (12) nautical mile Territorial Sea Boundary," to be administered by the Director of the FWS in a manner consistent with Executive Order No. 6935 of 1934 and Executive Order Nos. 8682 and 8729 of 1941.[15] The Kingman Reef NWR consists of "the emergent areas of Kingman Reef and also its surrounding submerged lands and waters out to the twelve (12) nautical mile Territorial Sea Boundary."

On January 6, 2009, by Presidential Proclamation, the Pacific Remote Islands Marine National Monument was created, which included Kingman Reef. Proclamation No. 8336, 74 Fed.Reg. 1565 (Jan. 6, 2009). The Presidential Proclamation noted that,

Palmyra Atoll is a classic Darwinian atoll that formed atop a sinking Cretaceous-era volcano. Kingman Reef formed in the same manner but is considered an atoll reef because it lacks permanent fast land areas or islands. Kingman Reef contains a sheltered lagoon that served as a way station for flying boats on Hawaii-to-American Samoa flights during the late 1930s. There are no terrestrial plants on the reef, which is frequently awash, but it does support abundant and diverse marine fauna and flora. Palmyra Atoll is managed by the United States Fish and Wildlife Service as a wildlife refuge.

In 2001, the Secretary of the Interior established National Wildlife Refuges at Palmyra Atoll and Kingman Reef. Palmyra Atoll and Kingman Reef are known to be among the most pristine coral reefs in the world, with a fully structured inverted food web. Kingman Reef is the most pristine of any reef under U.S. jurisdiction. They are ideal laboratories for assessing effects of climate change without the difficulty of filtering anthropogenic impacts. Both Palmyra Atoll and Kingman Reef support higher levels of coral and other cnidarian species diversity (180–190 species) than any other atoll or reef island in the central Pacific, twice as many as are found in Hawaii or Florida.

*Id.* at 1566–67.

On March 4, 2005, KRAI brought an action to quiet title to Kingman Reef, pursuant to the federal Quiet Title Act, 28 U.S.C. § 2409a (2006), in the United States District Court for the District of Hawaii. *See Kingman Reef Atoll Invs., L.L.C. v. United States,* 545 F.Supp.2d 1103. The defendant filed a motion to dismiss, which the District Court denied, without prejudice, and the court permitted limited discovery on the issue of abandonment by the United States. *See id.* at 1109. Subsequently, defendant filed another motion to dismiss for lack of subject matter jurisdiction in the Hawaii case. The United States District Court for the District of Hawaii granted the defendant's motion to dismiss for lack of subject matter jurisdiction, for KRAI's failure to ini-

15. As an example of the implementation of the Kingman Reef NWR, FWS issued a "Special Use Permit" to Rusty Brainard, Ph.D., on December 29, 2005, which permitted Dr. Brainard to "con- duct quantitative assessments and monitoring of shallow reef fish assemblages at ... Kingman Reef NWR[ ]" from January 1 to April 30, 2006.

tiate the lawsuit within twelve years of the accrual of the claim. *Id.* The United States Court of Appeals for the Ninth Circuit issued a decision in *Kingman Reef Atoll Investments, L.L.C. v. United States*, 541 F.3d 1189 (9th Cir.2008), affirming the United States District Court for the District of Hawaii's decision to dismiss KRAI's quiet title action for lack of jurisdiction due to an expired statute of limitations. *Id.* at 1202.

Plaintiffs filed a Fifth Amendment takings claim in this court on December 6, 2006. Plaintiffs seek $54,500,000.00 as just compensation for the alleged taking by the United States government of the plaintiffs' private, compensable property interest in Kingman Reef. Plaintiffs allege a categorical and regulatory taking by the government as a result of the enactment of Secretarial Order No. 3223, which established the Kingman Reef National Wildlife Refuge.

This court issued an earlier opinion on June 17, 2010, challenging the jurisdiction of the court, which found that plaintiffs' takings action was not precluded. Following the decision by the United States Supreme Court in *United States v. Tohono O'Odham Nation*, — U.S. ——, 131 S.Ct. 1723, 179 L.Ed.2d 723 (2011), defendant asked to revisit jurisdiction, particularly the application of 28 U.S.C. § 1500 (2006).

## DISCUSSION

### Section 1500

Even if it is determined that plaintiff has submitted a claim under a money-mandating statute and otherwise complied with the jurisdictional requirements of the Tucker Act, 28 U.S.C. § 1491 (2006), subject matter jurisdiction, nevertheless, may be barred by 28 U.S.C. § 1500. Section 1500 provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, direct-

ly or indirectly under the authority of the United States.

28 U.S.C. § 1500. Following the court's earlier opinion in this case, dated June 17, 2010, the United States Supreme Court clarified the effect of 28 U.S.C. § 1500 in *Tohono O'Odham Nation* in 2011. In the words of the United States Supreme Court, Section 1500 "bars jurisdiction in the CFC [Court of Federal Claims] not only if the plaintiff sues on an identical claim elsewhere—a suit 'for' the same claim—but also if the plaintiff's other action is related although not identical—a suit 'in respect to' the same claim." *United States v. Tohono O'Odham Nation*, 131 S.Ct. at 1728. The Supreme Court explained, "two suits are for or in respect to the same claim when they are based on substantially the same operative facts." *Id.* at 1730 (citing *Keene Corp. v. United States*, 508 U.S. 200, 206, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993)). Therefore, this court again must address this court's jurisdiction to entertain plaintiffs' claims and consider whether plaintiffs' suits in the United States District Court and in this court "have sufficient factual overlap to trigger the jurisdictional bar." *United States v. Tohono O'Odham Nation*, 131 S.Ct. at 1731.

In *Tohono O'Odham Nation*, given the facts of the case before it, the Supreme Court concluded that there was sufficient, factual overlap between plaintiffs' suits in the United States District Court for the District of Columbia and the United States Court of Federal Claims, such that Section 1500 barred plaintiff's claims in the Court of Federal Claims. *See Tohono O'Odham Nation*, 131 S.Ct. at 1731. Briefly stated, the procedural history of *Tohono O'Odham Nation* was as follows. Plaintiff Tohono O'Odham Nation (The Nation) filed suit in the United States District Court for the District of Columbia the day prior to instituting its action at the United States Court of Federal Claims. *See Tohono O'odham Nation v. United States*, 79 Fed.Cl. 645, 646 (2007), *rev'd*, 559 F.3d 1284, *reh'g and reh'g en banc denied* (Fed.Cir. 2009), *cert. granted*, —— U.S. ——, 130 S.Ct. 2097, 176 L.Ed.2d 721 (2010), *rev'd*, —— U.S. ——, 131 S.Ct. 1723, 179 L.Ed.2d 723 (2011). In its District Court complaint, The Nation alleged that defendant

United States had failed to manage assets held in trust for The Nation in accordance with defendant's fiduciary duties. *See id.* at 646–47. Specifically, "[t]he district court complaint describes various examples of mismanagement, including the United States' failure to provide an adequate accounting of trust assets." *Id.* The Nation sought "a decree delineating the fiduciary duties owed to the Nation; a decree that the United States has breached those duties; a decree directing the United States to provide a complete, accurate, and adequate accounting of all of the trust assets and to comply with its fiduciary duties; a decree 'providing for the restatement of the Nation's trust fund account balances in conformity with this accounting;' and 'any additional equitable relief that may be appropriate (e.g. disgorgement, equitable restitution, or an injunction . . .),' " as well as a declaration that an accounting report prepared to reconcile The Nation's trust accounts was incomplete and inaccurate. *Id.* at 647 (citing Tohono O'Odham Nation's Prayer for Relief ¶ 6).

Similarly, The Nation's complaint in the United States Court of Federal Claims alleged that the United States had failed to comply with its fiduciary duties in managing trust assets, including "failure to keep and maintain accurate accounts." *Id.* at 647. The Nation sought money damages for the alleged breaches of trust and mismanagement of tribal funds. *See id.* Upon review, the Court of Federal Claims held that Section 1500 barred plaintiff's action because "it ar[ose] from the same operative facts and seeks the same relief as the claim in district court." *Id.* at 659.

On appeal, the Federal Circuit reversed, finding that the relief requested in each complaint differed such that the bar of Section 1500 did not apply. *See Tohono O'Odham Nation v. United States*, 559 F.3d 1284, 1293, *reh'g and reh'g en banc* denied (Fed.Cir. 2009), *cert. granted*, —— U.S. ——, 130 S.Ct. 2097, 176 L.Ed.2d 721 (2010), *rev'd*, —— U.S. ——, 131 S.Ct. 1723, 179 L.Ed.2d 723 (2011). The Supreme Court granted *certiorari*, reversed the Federal Circuit, and found that Section 1500 serves to bar a suit in the Court of Federal Claims, which was based on sub-stantially the same operative facts as the suit pending in another court, regardless of the relief sought. *See Tohono O'Odham Nation*, 131 S.Ct. at 1731–32.

Defendant contends that pursuant to the Supreme Court's opinion in *Tohono O'Odham Nation*, this court must dismiss plaintiffs' claims for lack of subject matter jurisdiction because plaintiffs' suits are based on substantially the same operative facts. First, defendant contends that Section 1500 bars jurisdiction in this court because "the complaint KRAI filed in the district court, and the subsequent complaint filed by both KRAI and its lessee, KRAD, in the CFC [Court of Federal Claims], asserted claims based on nearly identical operative facts." Second, despite the fact that KRAD was not itself a plaintiff in the District Court at the time it filed its complaint in this court, defendant argues that "[b]ecause KRAI represented KRAD's interests in Kingman Reef in the district court litigation, section 1500 precludes Plaintiff KRAD from bringing its claim in the CFC."

In their opposition to defendant's motion to dismiss, plaintiffs argue that this court should retain jurisdiction over plaintiff KRAI's claims because the type of relief sought in this case (monetary damages) and the federal case (quiet title) are distinct and because it would be inequitable to permit a plaintiff complete relief only where "the plaintiff in question is lucky enough to have filed the claims action first. . . ." As to plaintiff KRAD, plaintiffs argue that this court retains jurisdiction because plaintiff KRAD did not have a suit pending in any other court when it filed suit here and did not assign any interest to plaintiff KRAI, such that plaintiff KRAI could be considered an assignee of plaintiff KRAD for purposes of Section 1500.

In reply, defendant takes issue with plaintiffs' argument that this court should retain jurisdiction over plaintiff KRAI because plaintiff KRAI seeks different types of relief in this court and the federal District Court. According to defendant, in *Tohono O'Odham Nation*, the United States Supreme Court "clarified that Section 1500 precludes jurisdiction in the CFC if two pending suits 'are

based on substantially the same operative facts, regardless of the relief sought.'" 131 S.Ct. at 1731. Defendant also notes that, in *Tohono O'Odham Nation*, the United States Supreme Court rejected plaintiff's argument of inequity. The Supreme Court stated that, "[t]here is no merit to the Nation's assertion that the interpretation adopted here cannot prevail because it is unjust, forcing plaintiffs to choose between partial remedies available in different courts. The hardship in this case is far from clear." Defendant insists that permitting plaintiff KRAD to continue its suit in this court is contrary to the intention of Section 1500. Defendant argues that Section 1500 is designed to prevent "redundant litigation." As such, defendant urges "[t]he clear purpose of Section 1500—saving the Government from the burden of redundant litigation—is therefore served by ... precluding KRAI's lessee from pursuing claims in this Court that KRAI cannot." Defendant also reiterates its argument that plaintiff KRAD's claims are barred by Section 1500 because plaintiff KRAI, which filed suit in federal District Court, did so not only for its benefit, but also for the benefit of plaintiff KRAD. Defendant argues that the plaintiffs in this case too narrowly interpret the language "plaintiff or his assignees" in Section 1500 to mean "that either the assignor or the assignee, but not both, can be barred from filing a subsequent action at the CFC on the same operative facts, [thus] it necessarily follows that the assignee (KRAD) is not barred."

**Section 1500 Does Not Bar Plaintiff KRAD's Claims**

■ As to plaintiff KRAD, Section 1500 does not apply. Section 1500 bars jurisdiction "of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States...." 28 U.S.C. § 1500. Even assuming, *arguendo*, that plaintiff KRAD is an assignee, it did not "ha[ve] pending" a suit in any other court at the time it filed suit here. Only plaintiff KRAI had a suit pending in another court.

Defendant contends that KRAD is an assignee of KRAI, whose interests are "legally dependent on KRAI's claim that it owns Kingman Reef, its lagoons and surrounding waters. Accordingly, any actions taken by KRAI to prove, establish or confirm its alleged title to Kingman Reef are not just for the benefit of KRAI, but also for the benefit of KRAD...." Thus, defendant contends, "[f]or purposes of section 1500, KRAD is an assignee of KRAI and therefore is precluded from bringing a suit in the CFC that is 'for or in respect to the same claim' that KRAI was pursuing, both for its own benefit on [sic] for the benefit of its lessee KRAD, in the district court." Defendant expands Section 1500 to bar an assignee's claim in this court if its assignor has a case pending in the District Court when it files suit in the Court of Federal Claims, if the decision in the District Court case can be beneficial to the assignee.

Defendant also argues that plaintiffs too narrowly define the term "assignee" as requiring KRAD to transfer property rights to KRAI, whereas, defendant argues, an assignment is the transfer of rights or property. For defendant's proposition that an assignment is a transfer of rights or property, defendant relies on *Webb & Associates, Inc. v. United States*, 19 Cl.Ct. 650 (1990) and *Wolfchild v. United States*, 96 Fed.Cl. 302, 318 (2010). *Webb* and *Wolfchild*, however, do not assist the defendant in the instant dispute. For instance, *Wolfchild* was not a Section 1500 case. And while it did concern an assignment, namely an assignment to plaintiffs of rights to use land held in trust by the United States Department of the Interior, there was no similar assignment in this case. *See Wolfchild v. United States*, 96 Fed.Cl. at 310.

In *Webb*, the United States Army entered into a lease with Conley Housing Corporation, which subsequently assigned its leasehold interest to John Adams. *See Webb & Assocs., Inc. v. United States*, 19 Cl.Ct. at 651. After the Army filed suit against Mr. Adams in District Court, Mr. Adams assigned his leasehold interest to plaintiff. *See id.* at 652. As a result, and before plaintiff filed a complaint at the Claims Court, both Mr. Adams and plaintiff filed a mandatory counterclaim against the Army. *See id.* at 650. Thus, in *Webb*, an assignee and its

assignor had a case pending in a United States District Court when the assignee filed suit in this court. *See id.* at 652. In *Webb*, the Army urged the court to dismiss plaintiff's claims under Section 1500 because "plaintiff's pending counterclaim in the district court raises the same claims as plaintiff's complaint." *Id.* at 651. The Claims Court found that it lacked jurisdiction over plaintiff assignee's claims under Section 1500.[16] *See id.* at 656. Unlike in *Webb*, plaintiff KRAI did not assign a leasehold interest to KRAD. Nor did plaintiff KRAD assign its leasehold interest to KRAI. Furthermore, unlike in *Webb*, KRAD did not have a case pending in the District Court when it filed suit in this court. Yet, according to defendant, KRAI "qualifie[d] as KRAD's assignee" because KRAD's leasehold interest was dependent upon KRAI's title to Kingman Reef, meaning that KRAI's suit at the District Court was "taken for the benefit of both KRAI *and* KRAD . . . ." (emphasis in original). Defendant's "benefit" test, however, is not implied in Section 1500, and defendant cites to no statute or other relevant support for such a test.

Plaintiffs assert that:

KRAI had no authority or consent to represent any interest that KRAD held under the lease or the license agreement in the QTA [quiet title action]. Instead, the QTA action [sic] was brought solely by KRAI to quiet title to Kingman Reef in KRAI and for the benefit of no other. . . . Defendant's argument is counter to the rule that an assignee stands in the shoes of the assignor, acquiring all of its rights and liabilities. Under defendant's theory, KRAD would not be precluded by Section 1500, but rather, would lack standing in this case as an assignor to maintain an action on a right it

assigned to KRAI. Section 1500 contemplates one party—a CFC "plaintiff or its assignee"—not an "assignee and assignor" as defendant suggests.

Defendant also points to a footnote in *Lummi Tribe of the Lummi Reservation v. United States*, 99 Fed.Cl. 584 (2011), in support of its "benefit" test concept to argue that, "[b]ecause KRAI represented KRAD's interests in Kingman Reef in the district court litigation, section 1500 precludes Plaintiff KRAD from bringing its claim in the CFC." In *Lummi*, the United States Court of Federal Claims held that 28 U.S.C. § 1500 deprived it of jurisdiction over plaintiff Fort Peck's claims because Fort Peck had a suit pending in a United States District Court when it filed suit in this court.[17] *See Lummi Tribe of the Lummi Reservation v. United States*, 99 Fed.Cl. at 592. The entirety of the footnote reads:

Because Fort Peck is not properly before this court, we need not determine whether all of the issues it attempts to assert here have been disposed of by the Tenth Circuit (and are thus binding on Fort Peck under the doctrine of res judicata) or whether any issue remains to be adjudicated. In any event, the remaining four plaintiffs were not parties in the district court litigation (nor were their interests represented there) and therefore they are not barred by the Tenth Circuit's decision.

*Id.* at 593 n. 7. The footnote is not particularly helpful to explain jurisdiction under Section 1500. The court in *Lummi* did not explain its reasoning for stating that the other plaintiffs were not parties, their interests were not barred, and they were not represented in the District Court. As noted above, defendant cites to no other case law or other justification to support its "benefit"

---

**16.** In *Webb*, the Claims Court retained jurisdiction over plaintiff assignee's fifth amendment claim because the District Court could not grant plaintiff the same type of relief as the Claims Court could (i.e., it requested different forms of relief in each forum, unavailable in the other forum). *See Webb & Assocs., Inc. v. United States*, 19 Cl.Ct. at 656. This interpretation of Section 1500, however, is now impacted by the United States Supreme Court's decision in *Tohono O'Odham Nation*, in which, as discussed above, the Supreme Court found that even if

different relief is sought, the effect of § 1500 is not defeated. *See United States v. Tohono O'Odham*, 131 S.Ct. at 1731.

**17.** At the time suit was brought in the Court of Federal Claims, the District Court case had concluded, but plaintiff still had time to appeal. The Court of Federal Claims, therefore, ruled that the lawsuit was still pending, which is not at issue in this case. *Lummi Tribe of the Lummi Reservation v. United States*, 99 Fed.Cl. at 592–93.

test. Neither plaintiff KRAD nor an assignee of KRAD had pending a suit in another court at the time it filed suit here based on substantially the same operative facts. Therefore, there is no reason to conclude that Section 1500 operates to bar plaintiff KRAD's claims in this court.

## Section 1500 Bars Plaintiff KRAI's claims

■ Plaintiffs assert that this court should retain jurisdiction over plaintiff KRAI's claim because depriving this court of jurisdiction would be unjust and because the complaints filed in the United States District Court and the Court of Federal Claims seek different relief. The United States Supreme Court in *Tohono O'Odham Nation*, however, has foreclosed plaintiffs' arguments. As quoted in full above, the Supreme Court rejected the argument that 28 U.S.C. § 1500 is unfair because it forces plaintiffs to choose between partial remedies available in different courts. Plaintiffs' assertion that this court should retain jurisdiction because KRAI sought different relief in the District Court, also fails.[18] As the Supreme Court stated, "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on substantially the same operative facts, regardless of the relief sought in each suit." *United States v. Tohono O'Odham Nation*, 131 S.Ct. at 1731.

The application of Section 1500 to KRAI turns on whether KRAI had pending, at the time it filed suit in the Court of Federal Claims, a suit in another court against the United States or a person acting under authority of the United States, based on substantially the same operative facts as the suit filed in this court, regardless of the relief sought. *See United States v. Tohono O'Odham Nation*, 131 S.Ct. at 1727, 1731. Plaintiff KRAI's suit against the United States, the United States Department of the Interior, United States government officials, and John and Jane Does, at the District Court, was pending, when over a year later, plaintiff

KRAI filed suit in this court. Plaintiff KRAI filed suit at the United States District Court for the District of Hawaii on March 4, 2005. The Hawaii District Court granted defendant's motion to dismiss on August 27, 2007, and the United States Court of Appeals for the Ninth Circuit affirmed the judgment of the District Court due to an expired statute of limitations on September 4, 2008. *See Kingman Reef Atoll Invs., L.L.C. v. United States*, 545 F.Supp.2d at 1116; *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d at 1194–95, 1202. The lawsuit in this court was filed on December 6, 2006.

■ "The question of whether another claim is 'pending' for purposes of § 1500 is determined at the time at which the suit in the Court of Federal Claims is filed, not the time at which the Government moves to dismiss the action." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1548 (Fed.Cir. 1994) (discussing the Supreme Court's opinion in *Keene Corp. v. United States*, 508 U.S. 200, 113 S.Ct. 2035), *aff'd*, 28 F.3d 1171, *reh'g and reh'g en banc declined* (Fed.Cir. 1994). Indeed, " 'the jurisdiction of the Court depends upon the state of things at the time of the action brought.' " *Keene Corp. v. United States*, 508 U.S. at 207, 113 S.Ct. 2035 (quoting *Mollan v. Torrance*, 9 Wheat. 537, 22 U.S. 537, 539, 6 L.Ed. 154 (1824) (Marshall, C.J.) (other citations omitted) (noting that the Court of Federal Claims correctly applied Section 1500 by "looking to the facts existing when Keene filed each of its complaints.")). The Federal Circuit's decision in *UNR Industries, Inc. v. United States*, 962 F.2d 1013, 1021 (Fed.Cir.), *cert. granted sub nom., Keene Corp. v. United States*, 506 U.S. 939, 113 S.Ct. 373, 121 L.Ed.2d 285 (1992), *aff'd sub nom., Keene Corp. v. United States*, 508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993), provides a clear analysis of the principle explained in *Keene*:

---

18. While plaintiffs did not press that the differing legal theories they raised at the District Court and this court preclude the application of Section 1500, that argument was foreclosed in *Keene Corp. See Keene Corp. v. United States*, 508 U.S. 200, 212, 113 S.Ct. 2035 ("That the two actions were based on different legal theories did not

matter.") (citation omitted); *see also United States v. Tohono O'Odham Nation*, 131 S.Ct. at 1732 (Sotomayor, J., concurring) ("It was irrelevant for purposes of § 1500, we observed [in *Keene Corp.*], that the two suits proceeded on different legal theories.") (citation omitted).

Therefore, we hold today that in accordance with the words, meaning, and intent of section 1500: 1) if the same claim is pending in another court at the time the complaint is filed in the Claims Court, the Claims Court has no jurisdiction, regardless of when an objection is raised or acted on; 2) if the same claim is filed in another court after the complaint is filed in the Claims Court, the Claims Court is by that action divested of jurisdiction, regardless of when the court memorializes the fact by order of dismissal; and 3) if the same claim has been finally disposed of by another court before the complaint is filed in the Claims Court, ordinary rules of res judicata and available defenses apply.... Appellants argue first that section 1500 only bars Claims Court jurisdiction when claimants have other cases pending on the date the Claims Court entertains a motion to dismiss. Thus, cases filed in other courts before the Claims Court complaint, but dismissed for whatever reason before a motion to dismiss is acted on by the Claims Court would be irrelevant. We think such a scheme would not only contradict the meaning and purposes of section 1500 but would create an arbitrary and whimsical jurisdictional result. By the plain language of section 1500, if the same claim is pending in another court when the plaintiff files his complaint in the Claims Court, there is no jurisdiction, period, even if the conflicting claim is no longer pending when a motion to dismiss is brought or considered by the court.

In light of the above, on the date that plaintiff KRAI filed suit in this court, its case in the United States District Court for the District of Hawaii was pending for purposes of Section 1500.

Thus, the remaining question is whether the suit in this court is based on substantially the same operative facts as KRAI's District Court suit. The Supreme Court's opinion in *Tohono O'Odham Nation* offers little specific guidance by way of defining what facts are operative and how substantially similar these facts must be. There is no set test to determine when, according to the Supreme Court, "two suits have sufficient factual overlap to trigger the jurisdictional bar." [19] *United States v. Tohono O'Odham Nation,* 131 S.Ct. at 1731. *Tohono O'Odham Nation* and common sense, however, do provide a general framework within which to work. In its decision, the Supreme Court stated in *Tohono O'Odham Nation:*

> The remaining question is whether the Nation's two suits have sufficient factual overlap to trigger the jurisdictional bar. The CFC dismissed the action here in part because it concluded that the facts in the Nation's two suits were, "for all practical purposes, identical." 79 Fed.Cl. 645, 656 (2007). It was correct to do so. The two actions both allege that the United States holds the same assets in trust for the Nation's benefit. They describe almost identical breaches of fiduciary duty—that the United States engaged in self-dealing and imprudent investment, and failed to provide an accurate accounting of the assets held in trust, for example. Indeed, it appears that the Nation could have filed two identical complaints, save the caption and prayer for relief, without changing either suit in any significant respect. Under § 1500, the substantial overlap in operative facts between the Nation's District Court and CFC suits precludes jurisdiction in the CFC. The Court of Appeals erred when it concluded otherwise. The holding here precludes the CFC from exercising jurisdiction over the Nation's suit while the District Court case is pending.

*Id.*

From this quote from *Tohono O'Odham Nation,* it appears that the United States

---

**19.** The United States Court of Appeals for the Federal Circuit in *Trusted Integration, Inc., v. United States,* 659 F.3d 1159, 1164 (Fed.Cir. 2011) concluded that after *Tohono O'Odham Nation,* the court must "determine whether two suits share substantially the same operative facts by applying the test developed in *Keene Corp.,* [508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993)]." The Federal Circuit, however, did not elaborate on what exactly the *Keene Corp.* test might be, other than to conduct a brief comparison of the conduct pleaded in the complaints plaintiff had filed at the United States District Court for the District of Columbia and the United States Court of Federal Claims. *Id.* at 1165. A review of *Keene Corp.* also reveals no more details of what the analysis should be.

Supreme Court determined that the operative facts concern the similarities between each action's (1) allegations as to the asset at issue, (2) events giving rise to each suit's legal theories, and (3) complaints as a whole. While this list may not be exhaustive, comparing the allegations, events, and complaints in plaintiff KRAI's two suits demonstrates that the operative facts are virtually indistinguishable. First, the allegations in KRAI's suits as to Kingman Reef, the asset at issue, are substantially the same. KRAI alleged the same operative facts about the reef in the United States District Court for the District of Hawaii and the Court of Federal Claims. For example, at the District Court, KRAI alleged that the United States had taken action to assert ownership over Kingman Reef. Similarly, at the Court of Federal Claims, plaintiffs alleged that the United States had taken definitive steps to acquire ownership of Kingman Reef. The complaints also describe similar conduct supporting the plaintiffs' legal theories. At the District Court, KRAI supported its quiet title action by describing the manner in which it claimed ownership of Kingman Reef and the steps which the United States took to take that ownership. At the Court of Federal Claims, plaintiffs support their takings action using the same facts to describe how they allegedly acquired ownership of Kingman Reef and how the United States took steps to take that ownership. Moreover, the complaints are nearly identical, not taking into account the caption and prayer for relief. A side-by-side comparison of the two complaints rendered in the table below provides a demonstration of the similarities.

| District Court Complaint | Court of Federal Claims Complaint |
| --- | --- |
| **Opening** | **Opening** |
| Plaintiff Kingman Reef Atoll Investments, L.L.C. ("Plaintiff") files this complaint for declaratory relief to quiet title and for immediate possession of Kingman Reef against Defendants United States of America ("USA"), the United States Department of Interior ("DOl"), the Honorable GALE A. NORTON, in her official capacity as Secretary of the Interior ("Secretary NORTON"), United States Fish & Wildlife Service ("FWS") and STEVEN A. WILLIAMS, in his official capacity as Director of Defendant FWS ("Director WILLIAMS") (Defendants USA, DOI, FWS, Secretary NORTON, Director WILLIAMS and Defendants DOES, as hereinafter defined, are collectively referred to herein as "Defendants") in connection with said Defendants' claim of ownership of Kingman Reef Atoll ("Kingman Reef") in 2001 which claim is adverse to Plaintiff, is without any right and is a cloud upon the title of Plaintiff. Defendants have no estate, right, title lien or interest in or to Kingman Reef or any part of it. In support of this complaint, Plaintiff alleges as follows. | Plaintiffs KINGMAN REEF ATOLL INVESTMENTS, L.L.C. ("KRAI") and KINGMAN REEF ATOLL DEVELOPMENT, L.L.C. ("KRAD" and together with KRAI, collectively, "Plaintiff") files this complaint for monetary damages against Defendants United States of America ("USA"), the United States Department of Interior ("DOI"), the Honorable DIRK KEMPTHORNE, in his official capacity as Secretary of the Interior ("Secretary KEMPTHORNE"), United States Fish & Wildlife Service ("FWS") and H. DALE HALL, in his official capacity as Director of Defendant FWS ("Director HALL") (Defendants USA, DOI, FWS, Secretary KEMPTHORNE, Director HALL and Defendants DOES, as hereinafter defined, are collectively referred to herein as "Defendants") in connection with said Defendants' taking of Plaintiff's private property and related private interests in and to Kingman Reef Atoll. In support of this complaint, Plaintiff alleges as follows. |
| **Introduction** | **Introduction** |
| 1. Kingman Reef is located approximately 900 nautical miles south of Hawaii. | Kingman Reef Atoll ("Kingman Reef") is an emergent coral reef with a central lagoon and surrounding waters located approximately 900 nautical miles south of Hawaii. |

2. In 1922, Lorrin A. Thurston annexed Kingman Reef to the United States and claimed legal ownership of the same for The Island of Palmyra Copra Company ("Copra Co."). On August 14, 1922, Copra Co. conveyed Kingman Reef to Ellen Fullard–Leo.

3. In 1922, Lorrin A. Thurston annexed Kingman Reef to the United States and claimed legal ownership of the same for The Island of Palmyra Copra Company ("Copra Co."). On August 14, 1922, Copra Co. conveyed Kingman Reef to Ellen Fullard–Leo.

3. By mesne conveyances, title to Kingman Reef was held collectively by Leslie, Dudley and Ainsley Fullard–Leo. On November 17, 2000, title to Kingman Reef was conveyed to Plaintiff.

4. By mesne conveyances, title to Kingman Reef was held collectively by Leslie Fullard–Leo, Dudley Fullard–Leo and Ainsley Fullard–Leo. On November 17, 2000, title to Kingman Reef was conveyed to Plaintiff KRAI.

4. From 1922 to the present, Plaintiff and its predecessors-in-interest have owned Kingman Reef.

5. From 1922 to the present, Plaintiff KRAI and its predecessors-in-interest have owned Kingman Reef.

5. From 1922 to 2001, neither the Territory of Hawaii, State of Hawaii nor Defendants made any claim of title to Kingman Reef nor recorded any document claiming same.

6. From 1922 to 2001, neither the Territory of Hawaii, State of Hawaii nor Defendants made any claim of title to Kingman Reef nor recorded any document claiming the same.

6. On January 18, 2001, Defendant DOl issued Order No. 3223 establishing a National Wildlife Refuge at Kingman Reef ("Kingman Reef NWR").

7. On January 18, 2001, Defendant DOI issued Order No. 3223 establishing a National Wildlife Refuge at Kingman Reef ("Kingman Reef NWR").

7. The designation was the culmination of FWS's effort to illegally acquire and claim title to Kingman Reef and ignore its rightful owner—the Plaintiff. Plaintiff is owned by the Fullard–Leo Family of Hawaii who has owned Kingman Reef since 1922.

8. The Kingman Reef NWR was the final act in a series of actions by FWS to acquire Kingman Reef in complete disregard of the asserted interests of its rightful owner—Plaintiff KRAI and the Fullard–Leo Family of Hawaii, which has owned Kingman Reef since 1922, and Plaintiff KRAD's leasehold interest therein.

9. The Kingman Reef NWR unlawfully wrests title to Kingman Reef from Plaintiff KRAI and the Fullard–Leo Family to allegedly place ownership in the hands of the United States Government. The Kingman Reef NWR takes from Plaintiff and the Fullard–Leo Family the entire bundle of rights encompassed by ownership including all of their rights and entitlements to access, use, enjoy the ecological value and provide for measured development of economic opportunities at and around Kingman Reef.

10. The Complaint is based on the United States' categorical and regulatory taking of Plaintiff's privately owned interests in certain real property and contractual interests in such privately owned real property without just compensation in violation of the Fifth Amendment to the United States Constitution. The Plaintiff has brought this action for payment of just compensation for the United States' unconstitutional taking of its property.

Facts

## A. KINGMAN REEF BACKGROUND INFORMATION

22. Kingman Reef is located approximately 900 nautical miles southwest of Hawaii in the Pacific Ocean. Kingman Reef is 33 nautical miles north of the Palmyra Atoll and essentially sits half-way between the Hawaiian Islands and Samoa at Latitude 6° 24' 37" North and Longitude 162° 22' West.

23. Kingman Reef is a low-lying coral reef atoll that is comprised of emergent land. The emergent land and submerged coral reefs surround a central lagoon which ranges in depth from 50 to 250 feet.

24. Kingman Reef was allegedly first discovered in 1798 by Captain Edmund Fanning, and allegedly rediscovered by Captain W.E. Kingman in 1853.

25. In 1922, Lorrin A. Thurston annexed Kingman Reef to Defendant USA and claimed ownership for the Copra Co., a corporation under the laws of the Territory of Hawaii.

26. Leslie Fullard–Leo and Ellen Fullard–Leo, the subsequent owners of Kingman Reef, were the President and Secretary–Treasurer, respectively of the Copra Co.

27. Kingman Reef is currently an unincorporated United States territory.

28. Kingman Reef was administered by the Department of Navy from 1934 to 2000. On December 29, 1934, President Franklin D. Roosevelt signed Executive Order 6935 that placed Kingman Reef under the Secretary of the Navy for administrative purposes.

29. Subsequently, Executive Order 8682 dated February 14, 1941, as amended by Executive Order 8729 dated April 2, 1941, established Naval Defensive Sea Areas and Naval Airspace Reservations over "the territorial waters between the extreme high-water marks and the three-mile marine boundaries" surrounding Kingman Reef and a number of

Facts

## A. KINGMAN REEF BACKGROUND INFORMATION

26. Kingman Reef is located approximately 900 nautical miles southwest of Hawaii in the Pacific Ocean. Kingman Reef is approximately 33 nautical miles north of the Palmyra Atoll and essentially sits half-way between the Hawaiian Islands and Samoa at Latitude 6° 24' 37" North and Longitude 162° 22' West.

27. Kingman Reef is a low-lying coral reef atoll that is comprised of two small spits of emergent land, surrounding reefs, lagoon and waters. The emergent land and submerged coral reefs surround a central lagoon which ranges in depth from 50 to 250 feet.

[34. Kingman Reef was allegedly first discovered in 1798 by Captain Edmund Fanning, and allegedly rediscovered by Captain W.E. Kingman in 1853.] [20]

[35. In 1922, the Copra Co., a corporation under the laws of the Territory of Hawaii, through is [sic] agent Lorrin A. Thurston annexed Kingman Reef to Defendant USA and claimed ownership for the Copra Co.]

[36. Leslie Fullard–Leo and Ellen Fullard–Leo, the subsequent owners of Kingman Reef, were the President and Secretary–Treasurer, respectively of the Copra Co.]

28. Kingman Reef is currently an unincorporated United States territory.

29. Defendants FWS and DOI have described the value of Kingman Reef as "priceless".

30. Kingman Reef was administered by the Department of Navy from 1934 to 2000. On December 29, 1934, President Franklin D. Roosevelt signed Executive Order 6935 that placed Kingman Reef under the Secretary of the Navy for administrative purposes.

31. Subsequently, Executive Order 8682 dated February 14, 1941, as amended by Executive Order 8729 dated April 2, 1941, established Naval Defensive Sea Areas and Naval Airspace Reservations over "the territorial waters between the extreme high-water marks and the three-mile marine boundaries" surrounding Kingman Reef and a number of

**20.** Paragraph numbers 34–37 from the Court of Federal Claims complaint are bracketed because they are presented out of order in the table. Paragraph numbers 34–37 in the Court of Federal Claims complaint correspond to paragraph numbers 24–26 and 31 in the District Court complaint, as shown.

other Pacific islands, including Palmyra Island, "and the airspaces over the said territorial waters and islands", respectively, for national defense purposes. Thus, Executive Order 8682, as amended, did not impose restrictions over Kingman Reef itself.

30. The "object of the executive order [8682] was to give the commandant necessary authority to control subversive activities and safeguard the national defense." Furthermore, proper provision [was directed to] be made under the authority given the Secretary of the Navy so as to permit bona fide residents of the areas reasonable means of transportation and communication to and from the islands.

31. The Fullard–Leo Family owned and held title to Kingman Reef from 1922 to November 17, 2000 when title was transferred to Plaintiff.

32. Plaintiff entered into a real property lease agreement with Kingman Reef Atoll Development, L.L.C., a Hawaii limited liability company ("KRAD") concerning the use, development and protection of Kingman Reef.

33. KRAD also entered into a real property license agreement with Kingman Reef Enterprises, L.L.C. ("KRE") concerning commercial fishing in and around Kingman Reef.

34. Title to Kingman Reef is not now, nor has it ever been, held by Defendant USA or any governmental instrumentality or agency of Defendant USA. The private ownership of Kingman Reef is readily ascertainable from the public record and has been admitted and acknowledged by Defendant USA, the U.S. Senate, U.S. Navy, U.S. Department of Commerce and Defendant FWS.

## B. THE PRIVATE ANEXATION AND PLAINTIFF'S OWNERSHIP OF KIGMAN REEF

35. On April 28, 1922, the Copra Co. noted in its Board meeting minutes that "[i]t was reported that a plan was on foot to claim Kingman's Reef ... [and that] this Reef could be of inestimable value to this Company...."
and should be claimed "either on the out or homeward voyage of the Palmyra during her next trip."

36. On May 3, 1922, Copra Co. instructed and commissioned its agent, Lorrin A. Thurston, to proceed to the atoll known as "Kingman's

other Pacific islands, including Palmyra Island, "and the airspaces over the said territorial waters and islands", respectively, for national defense purposes. Thus, Executive Order 8682, as amended, did not impose restrictions over Kingman Reef itself.

32. The "object of the executive order [8682] was to give the commandant necessary authority to control subversive activities and safeguard the national defense." Furthermore, "proper provision [was directed to] be made under the authority given the Secretary of the Navy so as to permit bona fide residents of the areas reasonable means of transportation and communication to and from the islands."

[37. The Fullard–Leo Family owned and held title to Kingman Reef from 1922 to November 17, 2000 when title was transferred to Plaintiff KRAI, a limited liability company established by the Fullard–Leo Family.]

33. Title to Kingman Reef is not now, nor has it ever been, held by Defendant USA or any governmental instrumentality or agency of Defendant USA. The private ownership of Kingman Reef is readily ascertainable from the public record and has been admitted and acknowledged by Defendant USA, the U.S. Senate, U.S. Navy, U.S. Department of Commerce and Defendant FWS.

## B. THE PRIVATE ANNEXATION AND PLAINTIFF KRAI'S OWNERSHIP OF KINGMAN REEF

38. On April 28, 1922, the Copra Co. noted in its Board meeting minutes that "[i]t was reported that a plan was on foot to claim Kingman's Reef ... [and that] this Reef could be of inestimable value to this Company ...."
and should be claimed "either on the out or homeward voyage of the Palmyra during her next trip."

39. On May 3, 1922, Copra Co. instructed and commissioned its agent, Lorrin A. Thurston, to proceed to the atoll known as "Kingman's

Reef", and to take formal possession of said atoll on behalf of Defendant USA "and claim the same for [the Copra Co]." The Commission was signed by "L Fullard–Leo, President" and "E Fullard–Leo, Secretary–Treasurer".

37. On May 10, 1922, Mr. Thurston landed on Kingman Reef from the company's ship "Palmyra" and did annex the atoll, its reefs and lagoon as instructed and claimed the ownership of same for the Copra Co. The annexation documents were signed by Mr. Thurston and five companions and read: that on the 10th day of May A.D.1922, the undersigned, agent of the ISLAND OF PALMYRA COPRA CO., LTD (an Hawaiian Corporation), landed from the motorship "Palmyra" doth, . . . take formal possession of this Island called "Kingman's Reef" . . . on behalf of the United States of America, and claim the same for said Company.

38. The party built a cairn of coral slabs about four feet high and flew an American flag from a pole supported by the cairn. The formal certificate of possession, together with the flag and a copy of The Advertiser and The Star Bulletin of May 3, 1922 were placed in a glass jar and deposited in the base of the coral cairn.

39. Annexation vested title to Kingman Reef in the Copra Co. Annexation of Kingman Reef did not vest title in Defendant USA. Kingman Reef was annexed to the United States solely for purposes of extending the sovereignty of Defendant USA to Kingman Reef.

40. The Certificate of Annexation signed by Mr. Thurston expressly stated that he claimed Kingman Reef as the property of the Copra Co.

41. By letter dated May 13, 1922 from Mr. Thurston to Mrs. Ellen Fullard–Leo, Mr. Thurston confirmed that he claimed title to Kingman Reef for the Copra Co. and that she would be filing the claim at Washington, D.C. according to instructions from "Mr. Huber", who, upon information and belief, was the U.S. Attorney General for the Territory of Hawaii, at that time.

42. Further, by letter dated May 14, 1922, Mr. Thurston suggested that Kingman Reef be surveyed to determine its beneficial use and offered to help if "advisable from the companies (sic) standpoint . . . so far as se-

Reef", and to take formal possession of said atoll on behalf of Defendant USA "and claim the same for Island of Palmyra Copra Company [the Copra Co]." The Commission was signed by "L Fullard–Leo, President" and "E Fullard–Leo, Secretary–Treasurer".

40. On May 10, 1922, Mr. Thurston landed on Kingman Reef from the company's ship "Palmyra" and did annex the atoll, its reefs and lagoon as instructed and claimed the ownership of same for the Copra Co. The annexation documents were signed by Mr. Thurston and five companions and read: that on the 10th day of May A.D.1922, the undersigned, agent of the ISLAND OF PALMYRA COPRA CO., LTD (an Hawaiian Corporation), landed from the motor-ship "Palmyra" doth, . . . . take formal possession of this Island called "Kingman's Reef". . . on behalf of the United States of America, and claim the same for said Company.

41. The party built a cairn of coral slabs about four feet high and flew an American flag from a pole supported by the cairn. The formal certificate of possession, together with the flag and a copy of The Advertiser and The Star Bulletin of May 3, 1922 were placed in a glass jar and deposited in the base of the coral cairn.

42. Annexation was intended to and did vest title to Kingman Reef in the Copra Co. Annexation of Kingman Reef was not intended to and did not vest title in Defendant USA. Kingman Reef was annexed to the United States solely for purposes of extending the sovereignty of Defendant USA to Kingman Reef.

43. The Certificate of Annexation signed by Mr. Thurston expressly stated that he claimed Kingman Reef as the property of the Copra Co.

44. By letter dated May 13, 1922 from Mr. Thurston to Mrs. Ellen Fullard–Leo, Mr. Thurston confirmed that he claimed title to Kingman Reef for the Copra Co. and that she would be filing the claim at Washington, D.C. according to instructions from "Mr. Huber", who, upon information and belief, was the U.S. Attorney General for the Territory of Hawaii, at that time.

curing authentic data is concerned and otherwise." In this regard, subsequently, by letter dated June 22, 1925, to Admiral R.E. Coontz, U.S.N., Mr. Thurston suggested that the United States Navy secure both Palmyra and Kingman Reef for "refreshment and supply stations both for naval ships and flying boats" and noted that Kingman Reef together with Palmyra "passed by purchase to the ownership of Mr. L. Fullard–Leo an American citizen of Honolulu."

43. On July 15, 1922, "E. Fullard–Leo, Secretary–Treasurer" of Copra Co. sent a letter to the Honorable Charles E. Hughes, Secretary of State, Washington, D.C., advising him, among other things, that the company annexed, on May 10, 1922, in the name of the United States of America, and for [Copra Co.'s] own use, an atoll island chaired as "Kingman's Reef" but never before claimed.... According to the United States Attorney here, this notification is all that is necessary in addition to listing the same in our local tax returns, as the Palmyra Islands are a part of the county of Honolulu. Hoping that this is sufficient evidence that the same will be recorded and due credit given this Company and Territory .... Enclosed was a copy of the proclamation of possession and report by Lorrin A. Thurston, "who attended to the necessary formalities for the Company, as well as newspaper reports covering the matter."

44. On August 14, 1922, the Fullard–Leo Family acquired direct ownership of Kingman Reef from the Copra Co. A resolution was introduced and unanimously adopted by the Copra Co. to convey to Ellen Fullard–Leo all of the company's rights of whatsoever nature in the newly annexed territory of Kingman Reef.

45. On September 28, 1922, the Department of State, Washington, D.C., acknowledged receipt of the July 15, 1922 letter from the Copra Co., together with its enclosures, regarding the annexation and ownership by the Copra Co. of "Kingman's Reef", and the Copra Co.'s follow up letter of August 24, 1922, inquiring whether its July 15, 1992 [sic] was received. The Department of State did not dispute the Copra Co.'s claim to ownership of Kingman Reef.

46. On June 22, 1925, Mr. Thurston again confirmed that Copra Co. owned Kingman Reef in a letter to Admiral R.E. Coontz detailing, among other things, that he had "sailed direct from Honolulu to Kingmans,

45. On July 15, 1922, "E. Fullard–Leo, Secretary–Treasurer" of Copra Co. sent a letter to the Honorable Charles E. Hughes, Secretary of State, Washington, D.C., advising him, among other things, that the company annexed, on May 10, 1922, in the name of the United States of America, and for [Copra Co.'s] own use, an atoll island charted as "Kingman's Reef" but never before claimed.... According to the United States Attorney here this notification is all that is necessary in addition to listing the same in our local tax returns, as the Palmyra Islands are a part of the county of Honolulu. Hoping that this is sufficient evidence that the same will be recorded and due credit given this Company and Territory .... Enclosed was a copy of the proclamation of possession and report by Lorrin A. Thurston, "who attended to the necessary formalities for the Company, as well as newspaper reports covering the matter."

46. On August 14, 1922, the Fullard–Leo Family acquired direct ownership of Kingman Reef from the Copra Co. A resolution was introduced and unanimously adopted by the Copra Co. to convey to Ellen Fullard–Leo all of the company's rights of whatsoever nature in the newly annexed territory of Kingman Reef in return for "sundry unsecured loans."

47. On September 28, 1922, the Department of State, Washington, D.C., acknowledged receipt of the July 15, 1922 letter from the Copra Co., together with its enclosures, regarding the annexation and ownership by the Copra Co. of "Kingman's Reef", and the Copra Co.'s follow up letter of August 24, 1922, inquiring whether its July 15, 1992 [sic] was received. The Department of State did not dispute the Copra Co.'s claim to ownership of Kingman Reef.

landed and annexed the island in the name of the Palmyra Copra Company American Company, in accordance with the terms of American law."

47. Further, by letter dated July 9, 1926 on The Honolulu Advertiser letterhead to "The Archives Commission Territory of Hawaii", Mr. Thurston recounted his visit to Kingman Reef in June 1926 as a guest on the "U.S.S. Whippoorwill, captain, Lieut. Poland, U.S.N." during which time he examined the record, jar and flag left by him in 1922 on Kingman Reef. To protect the flag and, records against disintegration and the danger that the same may otherwise become valueless because the bottle top was rusted and cork partially rotted, Mr. Thurston removed the record and flag for deposit with The Archives Commission (a record left in the cairn in November 1924 by "W.G. Anderson and others" who visited Kingman Reef and inspected the bottle and its contents was also removed and deposited with The Archives Commission). A certificate evidencing the foregoing was signed by Captain Poland, enclosed in a bottle and left in the cairn on Kingman Reef. A copy of Captain Poland's certificate was also deposited with The Archives Commission by Mr. Thurston.

48. Mr. Thurston's July 9, 1926 letter to The Archives Commission also recognized Mrs. Ellen Fullard–Leo's ownership of Kingman Reef. He transmitted the evidence that he placed at Kingman Reef in 1922 to the Archives, so that it may be "kept on file in your office in Honolulu, subject to the order of the owner of said Kingman Island, or of the United States Government. I understand the present owner of said Kingman Island to be the (sic) Mrs. E. Fullard Leo of Honolulu, the successor of said Palmyra Company, Limited."

49. By letter dated July 24, 1926, the Archives of Hawaii acknowledged receipt of two glass containers—a fruit jar and a beer bottle—and Mr. Thurston July 9, 1926 letter and entered them on its receiving books and stated that "they now form an official part of our Archives of Hawaii." The July 24th letter further acknowledged and quoted Mr. Thurston's July 9th letter.

50. Through the 1920's and 1930's, several news articles were published regarding Copra Co.,'s acquisition of Kingman Reef.

48. By letter dated July 9, 1926 on The Honolulu Advertiser letterhead to "The Archives Commission Territory of Hawaii", Mr. Thurston recounted his visit to Kingman Reef in June 1926 as a guest on the "U.S.S. Whippoorwill, captain, Lieut. Poland, U.S.N." during which time he examined the record, jar and flag left by him in 1922 on Kingman Reef. To protect the flag and records against disintegration and the danger that the same may otherwise become valueless because the bottle top was rusted and cork partially rotted, Mr. Thurston removed the record and flag for deposit with The Archives Commission (a record left in the cairn in November 1924 by "W.G. Anderson and others" who visited Kingman Reef and inspected the bottle and its contents was also removed and deposited with The Archives Commission). A certificate evidencing the foregoing was signed by Captain Poland, enclosed in a bottle and left in the cairn on Kingman Reef. A copy of Captain Poland's certificate was also deposited with The Archives Commission by Mr. Thurston.

49. Mr. Thurston's July 9, 1926 letter to The Archives Commission also recognized Mrs. Ellen Fullard–Leo's ownership of Kingman Reef. He transmitted the evidence that he placed at Kingman Reef in 1922 to the Archives so that it may be "kept on file in your office in Honolulu, subject to the order of the owner of said Kingman Island, or of the United States Government. I understand the present owner of said Kingman Island to be the (sic) Mrs. E. Fullard Leo of Honolulu, the successor of said Palmyra Company, Limited."

50. By letter dated July 24, 1926, the Archives of Hawaii acknowledged receipt of two glass containers—a fruit jar and a beer bottle—and Mr. Thurston's July 9, 1926 letter and entered them on its receiving books and stated that "they now form an official part of our Archives of Hawaii." The July 24th letter further acknowledged and quoted Mr. Thurston's July 9th letter.

51. Through the 1920's and 1930's, several news articles were published regarding Copra Co.,'s acquisition of Kingman Reef.

## C. DEFENDANTS ACKNOWLEDGE PLAINTIFF'S OWNERSHIP OF KIGMAN REEF

51. Defendants and their numerous departments, agents and officers regarded Kingman Reef as privately owned and acknowledged Plaintiff (and its predecessors) and the Fullard–Leo Family as the owner.

52. Department of Navy and Defendants FWS and DOl have administered Kingman Reef in a manner consistent with Plaintiff's/Fullard–Leo Family's ownership of Kingman Reef.

53. The Preliminary Project Proposal dated August 1997 (attached to a memorandum from the then FWS Director Jane Rappaport Clark to the Regional Director, Region 1, FWS, approving the establishment of the "Palmyra Atoll National Wildlife Refuge and Kingman Reef National Wildlife Refuge") noted that: (a) Any "explorers wishing to visit Kingman Reef **must secure permission** from the Fullard–Leo family and the U.S. Coast Guard." (b) "Kingman Reef was annexed on behalf of the United States in 1922, by the Palmyra Copra Company (Fullard Leo family), and the **family claims ownership** . . . ." (c) "The **Landowners** are reportedly willing to sell their ands to prevent heirs from acquiring a large inheritance tax debt". (d) "Similarly, the **price for fee title** to Kingman Reef is unknown. Due to the negligible commercial real estate value, it might be possible to include it in the purchase price negotiated for Palmyra."

54. Further, in the October 2, 1997 Project Proposal authorizing the evaluation of Kingman Reef for NWR status, the then FWS Director Clark, the then Director of FWS, specifically admitted the Fullard–Leo Family's ownership: . . . Explorers wishing to visit Kingman Reef *must secure permission from the Fullard–Leo Family* . . . . Kingman Reef was annexed on behalf of the United States in 1922 by the Palmyra Copra Company (Fullard–Leo family), and the family claims ownership. The Service is proposing to study fee title acquisition of the Reef . . . *The landowners (Fullard–Leo) are reportedly willing to sell their lands* . . . . . . *the price for fee title to Kingman Reef is unknown.*

## C. DEFENDANTS ACKNOWLEDGE PLAINTIFF'S OWNERSHIP OF KINGMAN REEF

52. Defendants and their numerous departments, agents and officers regarded Kingman Reef as privately owned and admitted and acknowledged Plaintiff KRAI (and its predecessors) and the Fullard–Leo Family as the owner.

53. Department of Navy and Defendants FWS and DOI have administered Kingman Reef in a manner consistent with Plaintiff KRAI's/Fullard–Leo Family's ownership of Kingman Reef.

54. The Preliminary Project Proposal dated August 1997 (attached to a memorandum from the then FWS Director, Jane Rappaport Clark, to the Regional Director, Region 1, FWS, approving the establishment of the "Palmyra Atoll National Wildlife Refuge and Kingman Reef National Wildlife Refuge") noted that: (a) Any "explorers wishing to visit Kingman Reef **must secure permission** from the Fullard–Leo family and the U.S. Coast Guard." (b) "Kingman Reef was annexed on behalf of the United States in 1922, by the Palmyra Copra Company (Fullard Leo family), and **the family claims ownership** . . . ." (c) "The **Landowners** are reportedly willing to sell their lands to prevent heirs from acquiring a large inheritance tax debt". (d) "Similarly, the **price for fee title** to Kingman Reef is unknown. Due to the negligible commercial real estate value, it might be possible to include it in the purchase price negotiated for Palmyra." [21]

55. Further, Defendant FWS itself has admitted and acknowledged that Kingman Reef is privately owned by Plaintiff KAI [sic] in the October 2, 1997 Project Proposal authorizing the evaluation of Kingman Reef for NWR status, Jamie Rappaport Clark, the then Director of FWS, specifically admitted the Fullard–Leo Family's ownership: . . . Explorers wishing to visit Kingman Reef **must secure permission from the Fullard–Leo Family**. Kingman Reef was annexed on behalf of the United States in 1922, by the Palmyra Copra Company (Fullard–Leo family), and the family claims ownership. The Service is proposing to study *fee title acquisition* of the Reef . . . *The landowners [Fullard–Leo] are reportedly willing to sell their lands* . . . . . .

21. Emphasis throughout is in the original, save for section headings which the court has emphasized for clarity.

the price for fee title to Kingman Reef is unknown.

55. By letter dated October 3, 1997, to the U.S. Army Corps of Engineer at Fort Shafter, Robert F. Smith, Pacific Islands Manager for Defendant FWS noted, among other things, that the enclosed memorandum from the then FWS Director Clark gave Defendant FWS approval to begin detailed planning toward the acquisition of Palmyra Atoll and Kingman Reef as units of the National Wildlife Refuge System.

56. By letter dated October 3, 1997, to the U.S. Army Corps of Engineer at Fort Shafter, Robert F. Smith, Pacific Islands Manager for Defendant FWS noted, among other things, that the enclosed memorandum from the then FWS Director Clark gave Defendant FWS approval to begin detailed planning toward the acquisition of Palmyra Atoll and Kingman Reef as units of the National Wildlife Refuge System.

56. Furthermore, the U.S. Department of Commerce, National Oceanic and Atmospheric Administration's report dated October 17, 1997 acknowledged the Fullard–Leos' ownership of Kingman Reef: "The Fullard–Leo family owns Palmyra Island and Kingman Reef, and may claim ownership or jurisdiction over ocean resources and/or submerged lands seaward of the low-water mark. The exact extent of the Fullard–Leo claims is not clear, probably extending to the lagoons and reefs surrounding the islands, and perhaps extending to the breadth of the 'territorial' waters."

57. Furthermore, the U.S. Department of Commerce, National Oceanic and Atmospheric Administration's report dated October 17, 1997 acknowledged the Fullard–Leos' ownership of Kingman Reef: "The Fullard–Leo family owns Palmyra Island and Kingman Reef, and may claim ownership or·jurisdiction over ocean resources and/or submerged lands seaward of the low-water mark. The exact extent of the Fullard–Leo claims is not clear, probably extending to the lagoons and reefs surrounding the islands, and perhaps extending to the breadth of the 'territorial' waters."

57. In 1991, The Nature Conservancy met with Peter Savio, agent for the Fullard–Leo Family, to discuss, among other things, the sale and development of Kingman Reef. A memorandum prepared by Jim Maragos, The Nature Conservancy, dated August 19, 1991 stated, among other things, that Mr. Savio mentioned that the [Fullard–Leo family] claimed Kingman Reef and the buy-out option proposed by Mr. Savio should be seriously considered: "Transfer of Kingman Reef by the owners to the USFWS could also serve as compensation or mitigation for other impacts, and the USFWS is keenly interested in Kingman."

58. In 1991, The Nature Conservancy met with Peter Savio, agent for the Fullard–Leo Family, to discuss, among other things, the sale and development of Kingman Reef. A memorandum prepared by Jim Maragos, The Nature Conservancy, dated August 19, 1991 stated, among other things, that Mr. Savio mentioned that the [Fullard–Leo family] claimed Kingman Reef and the buy-out option proposed by Mr. Savio should be seriously considered: "Transfer of Kingman Reef by the owners to the USFWS could also serve as compensation or mitigation for other impacts, and the USFWS is keenly interested in Kingman."

58. More recently, the United States General Accounting Office ("GAO") continued to acknowledge the Fullard–Leo Family's claim of ownership of Kingman Reef. The GAO's "Report to the Chairman, Committee on Resources House of Representatives, U.S. Insular Areas, Application of the United States Constitution, (November, 1997)," specifically noted that: Kingman Reef has been claimed by the Fullard–Leo Family.

59. More recently, the United States General Accounting Office ("GAO") continued to acknowledge the Fullard–Leo Family's claim of ownership of Kingman Reef. The GAO's "Report to the Chairman, Committee on Resources, House of Representatives, U.S. Insular Areas, Application of the United States Constitution, (November, 1997)," specifically noted that: Kingman Reef has been claimed by the Fullard–Leo Family.

59. On October 26, 2000, the U.S. Senate Committee on Appropriations sent letters to Bruce Babbitt, then Secretary of the Interior, DOI, and Dan Glickman, Secretary of the Dept. of Agriculture, U.S. Dept. of Agriculture, that Congress provided additional fund-

60. On October 26, 2000, the U.S. Senate Committee on Appropriations sent letters to Bruce Babbitt, then Secretary of the Interior, DOI, and Dan Glickman, Secretary of the Dept. of Agriculture, U.S. Dept. of Agriculture, that Congress provided additional fund-

ing for "high priority land acquisitions" including, but not limited to "Palmyra Atoll/Kingman Reef".

60. In connection with the designation of the Kingman Reef NWR, on January 17, 2001, the FWS issued a Finding of No Significant Impact ["FONSI"]. In its FONSI, the FWS noted that a private entity, i.e., Plaintiff, claimed ownership of Kingman Reef.

61. The U.S. Navy has repeatedly acknowledged the Fullard–Leo Family's ownership of Kingman Reef and has asked for permission to have access to Kingman Reef. On numerous occasions since the imposition of Naval air and sea defensive zones in and around Kingman Reef in the 1940's, the Navy has directed requests for authorization to visit or access Kingman Reef to the Fullard Leo Family for review and approval.

### D. PLAINTIFF'S ACTS CONSISTENT WITH ITS OWNERSHIP OF KINGMAN REEF

62. Plaintiff and its predecessors-in-interest have, since 1922 to the present, have [sic] acted consistent with their ownership of Kingman Reef:

a. By letter dated August 15, 1931, Mr. L. Fullard–Leo made a request to the commanding officer of the United States Geodetic Surety ship "Pioneer" to make detailed suretys of Kingman Reef and Palmyra. By letter dated September 30, 1931, the Department of Commerce, U.S. Coast and Geodetic Survey responded that his request would be given careful consideration when its then current program in Hawaii neared completion.

b. From 1922 through 1959, the Fullard Leo Family paid real property taxes to the Territory of Hawaii for both Palmyra Atoll and Kingman Reef on the same tax key. After 1959, Hawaii state taxes were not levied because neither Palmyra Atoll nor Kingman Reef were included in the lands of the State of Hawaii.

c. Over the past 30 years, the Fullard–Leo Family, Plaintiff and Peter Savio, Plaintiff's agent, received referrals from the U.S. Navy, U.S. Coast Guard and/or U.S. National Marine Fisheries from persons and/or entities interested in entering upon and traversing across Kingman Reef.

d. Plaintiff was asked and did give permission to third parties from the private and public

ing for "high priority land acquisitions" including, but not limited to "Palmyra Atoll/Kingman Reef".

61. In connection with the designation of the Kingman Reef NWR, on January 17, 2001, the FWS issued a Finding of No Significant Impact ("FONSI"). In its FONSI, the FWS noted that a private entity, i.e., Plaintiff KRAI, claimed ownership of Kingman Reef.

62. The U.S. Navy has repeatedly acknowledged the Fullard–Leo Family's ownership of Kingman Reef and has asked for permission to have access to Kingman Reef. On numerous occasions since the imposition of Naval air and sea defensive zones in and around Kingman Reef in the 1940's, the Navy has directed requests for authorization to visit or access Kingman Reef to the Fullard Leo Family for review and approval.

### D. PLAINTIFF KRAI'S ACTS CONSISTENT WITH ITS OWNERSHIP OF KINGMAN REEF

63. Plaintiff KRAI and its predecessors-in-interest have, since 1922 to the present, have [sic] acted consistent with their ownership of Kingman Reef:

a. By letter dated August 15, 1931, Mr. L. Fullard–Leo made a request to the commanding officer of the United States Geodetic Survey ship "Pioneer" to make detailed surveys of Kingman Reef and Palmyra. By letter dated September 30, 1931, the Department of Commerce, U.S. Coast and Geodetic Survey responded that his request would be given careful consideration when its then current program in Hawaii neared completion.

b. From 1922 through 1959, the Fullard Leo Family paid real property taxes to the Territory of Hawaii for both Palmyra Atoll and Kingman Reef on the same tax key. After 1959, Hawaii state taxes were not levied because neither Palmyra Atoll nor Kingman Reef were included in the lands of the State of Hawaii.

c. Over the past 30 years, the Fullard–Leo Family, Plaintiff KRAI and Peter Savio, Plaintiff KRAI's agent, received referrals from the U.S. Navy, U.S. Coast Guard and/or U.S. National Marine Fisheries from persons and/or entities interested in entering upon and traversing across Kingman Reef.

d. Plaintiff KRAI was asked and did give permission to third parties from the private

sector, e.g., HA radio operators, scuba divers, photographer, to access Kingman Reef.

e. Mr. Ainsley Fullard–Leo received a call from Petty Officer Miller (Pearl Harbor Naval Base) who referred him to a photographer who was inquiring about visiting and photographing Kingman Reef.

f. Mr. Peter Savio received many requests for access to Kingman Reef that were referred to him by the U.S. Navy at Pearl Harbor. Navy personnel that contacted him acknowledged that the Fullard–Leo Family owned Kingman Reef and that third party requests to access Kingman Reef were directed to the Fullard–Leo Family.

g. When unauthorized uses of Kingman Reef were discovered, the Fullard–Leo Family took appropriate action to stop those uses, e.g., stopped person from Hilo, Hawaii who was fishing commercially in and around Kingman Reef without permission.

h. The Fullard–Leo Family's and Plaintiff's agent made voyages to Kingman Reef at their own expense in order to survey the Fullard–Leo property.

i. Mr. Dudley Fullard–Leo, Mr. Ainsley Fullard–Leo, Mr. Leslie Fullard Leo and Mr. Peter Savio, among others, have visited Kingman Reef at numerous times since 1940's.

j. In 1940's, Leslie Fullard–Leo went to Kingman Reef on a ship called "Joyita" and in mid to late 1950's again visited the property via ship.

k. Chuck Bradey, Captain, U.S. Navy who provided support services for The Nature Conservancy, visited Kingman Reef twice in the late 1990's and on each visit requested permission from the Fullard–Leo Family to access Kingman Reef.

l. Martin Vitousek, University of Hawaii professor, requested permission to visit Kingman Reef beginning in the 1960's through 1980's. Mr. Vitousek planted coconut trees on Kingman Reef at the request of the Fullard–Leo Family.

m. In the late 1980's, Peter Savio went to Kingman Reef in a U.S. Air Force plane and inspected Kingman Reef.

n. Over the past 20 years, and as recently as 2002, Mr. Ainsley Fullard–Leo gave permis-

and public sector, e.g., HAM radio operators, scuba divers, photographer, to access Kingman Reef.

e. Mr. Ainsley Fullard–Leo received a call from Petty Officer Miller (Pearl Harbor Naval Base) who referred him to a photographer who was inquiring about visiting and photographing Kingman Reef.

f. Mr. Peter Savio received many requests for access to Kingman Reef that were referred to him by the U.S. Navy at Pearl Harbor. Navy personnel that contacted him acknowledged that the Fullard–Leo Family owned Kingman Reef and that third party requests to access Kingman Reef were directed to the Fullard–Leo Family.

g. When unauthorized uses of Kingman Reef were discovered, the Fullard–Leo Family took appropriate action to stop those uses, e.g., stopped person from Hilo, Hawaii who was fishing commercially in and around Kingman Reef without permission.

h. The Fullard–Leo Family's and Plaintiff KRAI's agent made voyages to Kingman Reef at their own expense in order to survey the Fullard–Leo's property.

i. Mr. Dudley Fullard–Leo, Mr. Ainsley Fullard–Leo, Mr. Leslie Fullard Leo and Mr. Peter Savio, among others, have visited Kingman Reef at numerous times since 1940's.

j. In 1940's, Leslie Fullard–Leo went to Kingman Reef on a ship called "Joyita" and in mid to late 1950's again visited the property via ship.

k. Chuck Bradey, Captain, U.S. Navy who provided support services for The Nature Conservancy, visited Kingman Reef twice in the late 1990's and on each visit requested permission from the Fullard–Leo Family to access Kingman Reef.

l. Martin Vitousek, University of Hawaii professor, requested permission to visit Kingman Reef beginning in the 1960's through 1980's. Mr. Vitousek planted coconut trees on Kingman Reef at the request of the Fullard–Leo Family.

m. In the late 1980's, Peter B. Savio went to Kingman Reef in a U.S. Air Force plane and inspected Kingman Reef.

n. Over the past 20 years, and as recently as 2002, Mr. Ainsley Fullard–Leo gave permis-

sion to Mr. Bill Austin, captain of the ship "Machais" to visit Kingman Reef.

o. In October 1995, Mr. Dudley Fullard–Leo's son, Bryant Fullard–Leo, accompanied Mark Collins to Kingman Reef to survey in and around Kingman Reef over a 2 week-period.

p. In 1997 or 1998, Mr. Ainsley Fullard–Leo and Mr. Dudley Fullard–Leo traveled to Palmyra and on the way had the pilot circle Kingman Reef to inspect and ensure that no unauthorized uses were evident.

q. In 1998 or 1999, Mr. Ainsley Fullard–Leo and his wife inspected Kingman Reef via air.

r. Over the years, the Fullard–Leo Family received inquiries from Defendants DOI and FWS and the City & County of Honolulu to purchase Kingman Reef.

s. In late 1980's, Mr. Ainsley Fullard–Leo accompanied the U.S. Coast Guard during one of its law enforcement air patrols to Palmyra and Kingman Reef.

t. On November 17, 2000, title to Kingman Reef was transferred from Leslie Vincent Fullard–Leo, Trustee, Ainsley A.K. Fullard–Leo, Trustee and Dudley Leinani Fullard–Leo, Trustee, to Plaintiff, the Fullard–Leo Family's limited liability company. The deed was properly tiled and recorded in the United States District Court for the District of Hawaii on November 17, 2000 as Document No. 27. No similar deed has been tiled and recorded by Defendants.

u. After acquiring title to Kingman Reef, Plaintiff entered into a real property lease with Palmyra Development Co., Inc. and Kingman Reef Atoll Development LLC concerning the economic development opportunities for Kingman Reef. Thereafter, Kingman Reef Atoll Development LLC entered into a license agreement with Palmyra Pacific Seafoods, LLC and Kingman Reef Enterprises, LLC for the operation of a commercial fishing base camp at Kingman Reef.

sion to Mr. Bill Austin, captain of the ship "Machais" to visit Kingman Reef.

o. In October 1995, Mr. Dudley Fullard–Leo's son, Bryant Fullard–Leo, accompanied Mark Collins to Kingman Reef to survey in and around Kingman Reef over a 2 week-period.

p. In 1997 or 1998, Mr. Ainsley Fullard–Leo and Mr. Dudley Fullard–Leo traveled to Palmyra and on the way had the pilot circle Kingman Reef to inspect and ensure that no unauthorized uses were evident.

q. In 1998 or 1999, Mr. Ainsley Fullard–Leo and his wife inspected Kingman Reef via air.

r. Over the years, the Fullard–Leo Family received inquiries from Defendants DOI and FWS and the City & County of Honolulu to purchase Kingman Reef.

s. In late 1980's, Mr. Ainsley Fullard–Leo accompanied the U.S. Coast Guard during one of its law enforcement air patrols to Palmyra and Kingman Reef.

t. On November 17, 2000, title to Kingman Reef was transferred from Leslie Vincent Fullard–Leo, Trustee, Ainsley A.K. Fullard–Leo, Trustee and Dudley Leinani Fullard–Leo, Trustee, to Plaintiff KRAI, the Fullard–Leo Family's limited liability company. The deed was properly filed and recorded in the United States District Court for the District of Hawaii on November 17, 2000 as Document No. 27. No similar deed has been filed and recorded by Defendants.

u. After acquiring title to Kingman Reef, Plaintiff KRAI entered into a valid real property lease with Plaintiff KRAD for the purpose of facilitating economic development opportunities for Kingman Reef.

v. In accordance with the private property rights vested by the master lease, on November 17, 2000, Plaintiff KRAD entered into a valid real property license agreement with Kingman Reef Enterprises, L.L.C. a Washington limited liability company for the operation of a commercial fishing base camp at Kingman Reef and to conduct commercial fishing in and around the waters of Kingman Reef for a term of thirty (30) years.

**E. DEFENDANTS CLAIM OWNERSHIP OF KINGMAN REEF AND ESTABLISH THE KIGMAN REEF NATIONAL WILDLIFE REFUGE**

**THE UNCONSTITUTIONAL TAKING**

63. Defendants knew the Fullard–Leo Family had a long history of asserting ownership of Kingman Reef, including actions consistent therewith. Kingman Reef was nonetheless declared a national wildlife refuge without their prior knowledge and consent.

64. Defendants knew the Fullard–Leo Family had a long history of asserting ownership of Kingman Reef, including actions consistent therewith. Kingman Reef was nonetheless declared a national wildlife refuge without their prior knowledge and consent.

65. Plaintiff's ownership and other related private property interests associated with Kingman Reef remained wholly undisturbed by Defendant USA until December 11, 2000.

64. Despite requests to extend the time period for public comment on the issue of ownership of Kingman Reef by Plaintiff and other interested persons which were denied by Defendants, on January 18, 2001, the Secretary of the Interior signed Order No. 3223 establishing the Kingman Reef National Wildlife Refuge administered by the Director of Defendant FWS.

66. Despite requests to extend the time period for public comment on the issue of ownership of Kingman Reef by Plaintiff and other interested persons which were denied by Defendants, on January 18, 2001, the Secretary of the Interior signed Order No. 3223 establishing the Kingman Reef National Wildlife Refuge administered by the Director of Defendant FWS.

[No corresponding description of the creation of the Kingman Reef National Wildlife Refuge, other than that referenced in paragraphs 63 and 64. No taking alleged here.]

[Paragraphs 67–79 describe the creation of the Kingman Reef National Wildlife Refuge, and paragraphs 82–87 describe how the NWR was a taking.]

[Inapplicable as the suit here, at the United States District Court, was filed prior to the suit at the Court of Federal Claims.]

[Paragraphs 80–81 note that plaintiff filed sued at the United States District Court for the District of Hawaii.]

---

**Counts**

**Counts**

66. Plaintiff seeks a determination of its fee simple title in this action.

90. Plaintiff KRAI owns fee simple title to Kingman Reef.

67. Plaintiff is entitled to judgment finding that it is the sole owner of all right, title and interest in and to Kingman Reef to the exclusion of all other persons and entities and is entitled to the exclusive possession thereof.

96. Defendant USA effected a categorical taking of Kingman Reef without payment of just compensation in violation of the Fifth Amendment.

103. Defendant USA has not compensated Plaintiff for its regulatory taking of its private property and leasehold interests in violation of the Fifth Amendment.

---

Even a cursory review of the complaints demonstrates that the quiet title action in the District Court and the takings action in this court are based on substantially the same operative facts. Indeed, the complaints track each other almost word-for-word, differing very little and mainly only in their claims (quiet title versus taking) and the relief sought (declaratory versus monetary). Nowhere in their opposition to the govern-

ment's motion to dismiss do plaintiffs assert that the facts alleged by KRAI in the District Court and the facts alleged in the Court of Federal Claims are not substantially the same. Almost by way of conceding the similarity, plaintiffs state to this court, "*U.S. v. Tohono O'Odham Nation*, —— U.S. ——, 131 S.Ct. 1723, 179 L.Ed.2d 723 (2011) exacts an inequity by depriving KRAI of the chance to resolve this long fought dispute and depriving it from any relief.... The government now delivers yet one more blow by retroactive application of [sic] rule in *Tohono*. The *Tohono* case creates an unexpected hardship on KRAI and others in a similar position."

A comparison of the profile presented in the Kingman Reef cases to those of other cases involving 28 U.S.C. § 1500 decided after *Tohono O'Odham Nation*, reveals that the instant case is similar to cases in which the courts determined Section 1500 applied. For example, in *Trusted Integration, Inc. v. United States*, 659 F.3d at 1171, the United States Court of Appeals for the Federal Circuit found that two of three counts plaintiff pleaded at the United States Court of Federal Claims were barred by Section 1500 because comparison of the conduct pleaded at the Court of Federal Claims and a previously filed suit at the United States District Court for the District of Columbia revealed nearly identical facts.[22] The Federal Circuit determined that the differing legal theories and differing forms of relief sought were irrelevant to a determination under Section 1500. *See id.* at 1164, 1166. In *Rosebud Sioux Tribe v. United States*, 102 Fed.Cl. 429, 431–32 (2011), the United States Court of Federal Claims found that it lacked jurisdiction pursuant to Section 1500 to adjudicate plaintiff's claims for the mismanagement of tribal trust assets because plaintiff's previously filed claim at the United States District Court for the District of Columbia was based on substantially the same operative facts. The court in *Rosebud* conducted a side-by-side comparison of the complaints in reaching its decision and noted that while "certain facts may be needed to meet elements of proof of a legal theory articulated in one complaint

but not the other does not prevent a finding that two complaints constitute the same claim for purposes of § 1500." *Id.* at 435.

Similarly, in the case before this court, although plaintiffs' two complaints arise under different legal theories and try to seek different relief, a comparison of the complaints side-by-side reveals that the operative facts are substantially the same. While the facts are not identical, the United States Supreme Court in *Tohono O'Odham Nation* stated that to trigger Section 1500, the claims need not be identical, but can be "related," and that the statute requires only "sufficient factual overlap." *United States v. Tohono O'Odham Nation*, 131 S.Ct. at 1728, 1731. Furthermore, the additional facts in the complaint filed in the Court of Federal Claims, which do not appear in the District Court compliant, detail the federal government's physical and economical control over Kingman Reef, and are raised specifically in support of plaintiff's takings theory, and are not necessary for its quiet title action. The absence of those facts in the District Court complaint, therefore, has no impact on a Section 1500 determination. *See Rosebud Sioux Tribe v. United States*, 102 Fed.Cl. at 435 ("That certain facts may be needed to meet elements of proof of a legal theory articulated in one complaint but not the other does not prevent a finding that two complaints constitute the same claim for purposes of § 1500.").

Therefore, pursuant to 28 U.S.C. § 1500, which statutory requirement was in effect at the time plaintiffs' two complaints were filed, as now interpreted by the United States Supreme Court in *Tohono O'Odham Nation*, this court does not have jurisdiction over a plaintiff's suit when that plaintiff had pending in another court a suit against the United States, or a person acting under authority of the United States, based on substantially the same operative facts. Plaintiff KRAD is not implicated by Section 1500 because it did not have a suit pending in another court when it filed its complaint in the Court of Federal Claims. However, plaintiff KRAI did have a suit pending at the United States District

---

**22.** The court found that one of the counts was not barred by Section 1500 because the facts of that count were not substantially the same as the facts asserted in the District Court case. *See Trusted Integration, Inc. v. United States*, 659 F.3d at 1171.

Court for the District of Hawaii at the time it filed suit in this court, which was based on substantially the same operative facts as the suit filed in this court. Therefore, Section 1500 deprives this court of jurisdiction only of plaintiff KRAI's claim. This court retains jurisdiction over plaintiff KRAD's complaint.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is **GRANTED** as to plaintiff KRAI. Defendant's motion to dismiss is **DE-NIED** as to plaintiff KRAD.

**IT IS SO ORDERED.**